823 So.2d 1 (2001)
ToForest Onesha JOHNSON
v.
STATE of Alabama.
CR-98-0391.
Court of Criminal Appeals of Alabama.
June 29, 2001.
Rehearing Denied August 17, 2001.
*9 John William Cole, Birmingham, for appellant.
ToForest Johnson, pro se.
Bill Pryor, atty. gen., and Thomas F. Parker IV, asst. atty. gen. [Mr. Parker withdrew as counsel 1/24/2001.]
SHAW, Judge.[1]
The appellant, ToForest Onesha Johnson, was convicted of the murder of Jefferson County Deputy Sheriff William G. Hardy while Hardy was on duty or "because of some official or job-related act or performance," an offense made capital by § 13A-5-40(a)(5), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Johnson be sentenced to death. The trial court accepted the jury's recommendation and sentenced Johnson to death.
The evidence adduced at trial tended to show the following. On July 19, 1995, between 12:30 a.m. and 1:00 a.m., Deputy Hardy was shot and killed in the parking lot of a hotel in Birmingham. Deputy Hardy had been working a second job as a nighttime security guard at the hotel. Deputy Hardy was paid by the hotel while "moonlighting" as a security guard, but he *10 wore his deputy's uniform and drove his patrol car to the hotel.
Barry Rushakoff, the night manager of the hotel, testified that at approximately 12:30 a.m., he heard two "popping noises" coming from the rear parking lot of the hotel. (R. 355.) Rushakoff attempted to contact Deputy Hardy, who carried a portable radio with him, to investigate the noises, but Deputy Hardy did not respond. Rushakoff stated that he then received telephone calls from several guests of the hotel who reported that they had heard gunshots in the rear parking lot. Rushakoff telephoned emergency 911 to report the shots and to get backup support for Deputy Hardy. Rushakoff again attempted to contact Deputy Hardy over the radio, without success. Rushakoff then began walking to the rear of the hotel. On his way, Rushakoff passed a table in the atrium of the hotel where Deputy Hardy often sat. On the table, Rushakoff saw Deputy Hardy's radio, a cup of coffee, and a cigarette burning in an ashtray. When Rushakoff reached the glass doors at the rear of the hotel, he saw Deputy Hardy's body lying in the rear parking lot. Rushakoff returned to the front desk and telephoned 911 a second time to report that Deputy Hardy had been injured. Rushakoff stated that while he was on the telephone with the 911 operator, a guest of the hotel, Leonard Colvin, came to the front desk to inquire about car keys that Michael Ansley, his stepson, was supposed to have left for him earlier in the evening. Rushakoff had the keys at the front desk, and he gave them to Mr. Colvin. After completing the 911 call, Rushakoff went to the rear parking lot to wait for the police to arrive. According to Rushakoff, he did not see anyone, other than Deputy Hardy, in the parking lot while he was waiting for the police.
Larry Osborne was a guest at the hotel on the night of July 18-19, 1995. He was staying in a third-floor room facing the rear parking lot. Osborne testified that he was awakened in the middle of the night by a gunshot. He looked at the clock, which reflected 12:40 a.m., and within a few seconds heard a second gunshot. Osborne stated that he went to the window of his room and looked at the rear parking lot. He did not see anyone in the lot, but he did see a car directly under his window slowly pull out of the lot without its headlights on. Osborne described the car as an early 1980s model General Motors vehicle that appeared to be "greenish." (R. 398.) He stated, however, that the parking lot was illuminated by sodium vapor lights that cast a yellow tint on everything in the parking lot and that could have affected his perception of the color of the vehicle. Osborne stated that he remained in his hotel room until the ambulance arrived and Deputy Hardy's body became visible in a spotlight. He then went down to the parking lot and was later questioned by police.
Annie Colvin testified that she and her husband, Leonard Colvin, were also guests at the hotel on July 18-19, 1995. Colvin stated that she was driving her son's red Lexus coupe on July 18 and that she parked it in the parking lot at approximately 9:00 p.m. Her son, Michael Ansley, was supposed to drop off his second car, a gold Lexus sedan, pick up the red Lexus, and leave the keys to the gold Lexus at the hotel for Colvin sometime that evening. Colvin stated that she was awakened that night by gunshots and immediately woke her husband. Her husband went downstairs and retrieved the keys to the gold Lexus from the front desk of the hotel. The night manager, Rushakoff, stated that Ansley had dropped off the set of keys for Colvin at the front desk of the hotel at approximately 11:30 p.m. on July 18, 1995. *11 Rushakoff stated that Ansley was driving a red sports car at the time.
Several law-enforcement officers from Homewood, Birmingham, and the Jefferson County Sheriffs Department responded to the "double ought" dispatch, meaning officer down, that resulted from Rushakoff's second 911 call. Officer Rett Tyler with the Homewood Police Department was the first officer to arrive on the scene. Officer Tyler stated that when he arrived, he saw the body of a deputy sheriff in the rear parking lot. Although he did not know Deputy Hardy personally, Officer Tyler stated that he recognized the Jefferson County deputy's uniform. When Officer Tyler arrived, Deputy Hardy was still breathing, but was unconscious as a result of bullet wounds to the head. Officer Tyler stated that Deputy Hardy's pistol was still in its holster. At this point, several other officers and emergency personnel began arriving on the scene. The emergency personnel worked on Deputy Hardy briefly and then transported him to a hospital, where he ultimately died.
Dr. Robert Brissie, chief medical examiner for Jefferson County, performed an autopsy on Deputy Hardy on July 19, 1995. The initial exterior examination of Deputy Hardy's body and clothes revealed a bullet hole in the front of Deputy Hardy's hat that corresponded to an entrance wound on the front of Deputy Hardy's forehead and a bullet hole in the back of the hat that corresponded to an exit wound on the back of Deputy Hardy's head. Dr. Brissie stated that the soot pattern on Deputy Hardy's hat and face indicated that the shot to the forehead was fired from between 12 and 20 inches away. In addition, the autopsy revealed that the bullet entered Deputy Hardy's forehead at approximately a 15-degree upward angle. Dr. Brissie's examination also revealed a wound to the little finger and base of the thumb of Deputy Hardy's left hand, and to Deputy Hardy's left jaw. Dr. Brissie stated that, in his opinion, a single bullet passed through the tip of the left small finger, entered and exited the base of the left thumb and then entered Deputy Hardy's left lower lip and jaw. However, he stated that it was possible that the wounds to the left hand and the left jaw were caused by two bullets rather than one. Dr. Brissie stated that Deputy Hardy died from multiple gunshot wounds.
Testimony showed that during the initial investigation of the scene several different descriptions of automobiles that had been seen leaving the area were given to police and dispatched to the local police departments. One BOLO ("be on the lookout") was issued for a white Caprice automobile with two to three occupants; another was issued for a black vehicle. In addition, during the investigation, Sgt. Charlie Richardson, an evidence technician with the Jefferson County Sheriffs Department, discovered two 9mm shell casings in the parking lot. Sgt. Richardson stated that ballistics tests indicated that both shell casings had been fired from the same weapon. The weapon used to kill Deputy Hardy was never recovered.
James Evans, a patrol officer with the Homewood Police Department, testified that at approximately 4:00 a.m. on July 19, 1995, he received a dispatch to investigate a suspicious vehicle at a motel in Homewood; the vehicle matched the BOLO issued for a black vehicle. When he arrived at the motel, Officer Evans saw a 1972 black Monte Carlo automobile in the parking lot. A black male, later identified as Johnson, was standing by the driver's side door; another black male, later identified as Ardragus Ford, was seated in the front passenger seat of the car; a black female, later identified as Latanya Henderson, was seated in the backseat; and another black *12 female, later identified as Yolanda Chambers, was exiting the motel. After approaching the vehicle, Officer Evans and his partner moved Johnson to the rear of the vehicle and attempted to remove Ford from the passenger seat. Because Ford was paralyzed, he was unable to get out of the vehicle until his wheelchair was retrieved from the trunk. The suspects were patted down, and Johnson was subsequently arrested on an outstanding warrant unrelated to the shooting of Deputy Hardy. A taxi was called for Ford, Henderson, and Chambers because none of them could produce a driver's license, but the vehicle was not searched or towed; it remained in the motel parking lot.
Latanya Henderson testified that Yolanda Chambers telephoned her at home several times between 10:30 p.m. and 11:00 p.m. on July 18, 1995. At approximately 2:00 a.m. on July 19, 1995, Henderson said, Chambers, Johnson, and Ford arrived at her home in Ford's vehicle and asked her to go with them to get something to eat. She agreed, and the four individuals drove to the motel. Henderson stated that she was carrying a .25 caliber handgun in her purse and that she also saw Johnson carrying a gun that night; she did not describe Johnson's gun. According to Henderson, when they pulled into the parking lot of the motel, they saw a police car behind them. Henderson stated that Johnson hid his gun underneath the dashboard of the car and that she got out of the car and hid her gun under the tire of another car parked in the parking lot. Henderson testified that the gun remained hidden when she left the scene, but that several days later, she told the police about her gun and it was retrieved from the parking lot. Henderson stated that she did not see Chambers, Ford, and Johnson until 2:00 a.m. on July 19, 1995, and that she was not at the hotel when Deputy Hardy was shot. In addition, Henderson stated that she had previously been charged with hindering prosecution in relation to Deputy Hardy's murder, but that the charge had been dismissed the morning of her testimony.
Over objection, the State also presented evidence that Johnson had made several telephone calls in August 1995 from the Jefferson County jail that were overheard by a woman named Violet Ellison. Ellison testified that during these calls, she heard Johnson speak about the murder of Deputy Hardy and admit to shooting Deputy Hardy in the head. (See Part IX of this opinion for a detailed recitation of Violet Ellison's testimony.)
Johnson presented two alternative defenses at trial. First, through the testimony of Yolanda Chambers, Johnson asserted that, although he was present when Deputy Hardy was shot, he was not involved in the shooting and did not know the shooting was going to happen. Chambers testified that she was with Johnson, Ardragus Ford, and Latanya Henderson at the hotel on the night of July 18-19, 1995. She stated that when Deputy Hardy came out of the hotel, Ford, without warning, shot him once. Startled, Chambers looked away, and then heard a second gunshot. Chambers stated that she did not see who fired the second shot. Chambers admitted to lying to the police on several occasions during the investigation, and implicating several different people in Deputy Hardy's murder. Chambers testified that on different occasions she had told police that a man named Omar Berry had shot Deputy Hardy; that a man named Quintez Wilson had shot Deputy Hardy; and that Johnson had shot Deputy Hardy. Chambers also testified that she had told police (and she had testified at several different proceedings) that Deputy Hardy was murdered because he came out to the rear parking lot of the hotel and saw *13 a drug deal being consummated. In addition, Chambers testified that she had told police that she, Johnson, Ford, and Henderson were at the hotel to rob Michael Ansley. However, she stated that all of her previous statements to the police and her previous testimony at different proceedings were lies and that this time she was telling the truth.
Second, through the testimony of Montrice Dunning and Christi Farris, Johnson asserted an alibi defense. Dunning and Farris both testified that on a Tuesday night in July 1995, they were at "Tee's Place," a nightclub. They arrived at approximately 11:00 p.m. and left at approximately 2:00 a.m. Both stated that they saw Johnson at the nightclub several times between 11:00 p.m. and 2:00 a.m. and that Johnson walked them to their vehicle at 2:00 a.m. when they left. In addition, both stated that Johnson was wearing a navy blue "Tommy Hilfiger" brand shirt with stripes on the collar. (R. 849; 872.) A mugshot of Johnson, taken when he was arrested in the early morning hours of July 19, 1995, was introduced into evidence by the defense. In the photograph, Johnson is wearing a navy blue "Tommy Hilfiger" brand shirt with stripes on the collar. On cross-examination, Dunning stated that she did not know which Tuesday night in July she had seen Johnson at the nightclub, but that Johnson's defense counsel had told her that it was on July 18, 1995. Farris stated on cross-examination that she was positive that it was on the second Tuesday in July when she had seen Johnson at the nightclub. We take judicial notice that the second Tuesday in July 1995 was July 11, 1995, one week before Deputy Hardy was killed on July 19, 1995.
On appeal, Johnson raises 22 issues, most of which he did not raise by objection in the trial court. Because Johnson was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148-1152 (5th Cir. 1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. 1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. *14 denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Johnson contends that the trial court erred in denying his motion to prevent the State from "death-qualifying" prospective jurors because, he says, death-qualification is unconstitutional. (Issue XVII in Johnson's brief.) Although he concedes that the law is contrary to his contention, Johnson nevertheless argues that death-qualification of the venire violates the Fifth Amendment to the United States Constitution because, he says, "[a] citizen's feelings about the death penalty are political questions and not subject to official inquiry by the State." (Johnson's brief at p. 83.) This claim is meritless.
"[T]he State may properly ask the veniremembers questions pursuant to Witherspoon v. Illinois, [391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], and Wainwright v. Witt, [469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)]. The United States Supreme Court resolved this issue in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), holding that the Constitution does not bar the States from `death-qualifying' juries in capital cases, and that death-qualifying a jury does not deprive a defendant of a fair and impartial jury, and Alabama courts have consistently held likewise. Clemons v. State, 720 So.2d 961 (Ala.Crim.App. 1996); Williams v. State, [710 So.2d 1276, 1318 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997)]; Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996); Haney v. State, 603 So.2d 368, 391-92 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev'd in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala. Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985); Clark v. State, 451 So.2d 368 (Ala.Crim.App. 1984); Taylor v. State, 442 So.2d 128 (Ala.Crim.App.1983); McGinnis v. State, 382 So.2d 605 (Ala.Crim.App. 1979), cert. denied, 382 So.2d 609 (Ala. 1980)."
Travis v. State, 776 So.2d 819, 871 (Ala. Crim.App.1997), aff'd, 776 So.2d 874 (Ala. 2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). See also Gamble v. State, 791 So.2d 409 (Ala. Crim.App.2000); and Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). Accordingly, we find no error as to this claim.

II.
Johnson contends that the trial court erred in granting the State's challenge for cause as to prospective juror B.O. on the ground that he was opposed to the death penalty. (Issue III in Johnson's brief.) Johnson claims that "[w]hile conclusions can be drawn about how [B.O.] may have voted, there was no proof sufficient to show a biased verdict, merely proof that [B.O.] did not want to serve on the jury." (Johnson's brief at p. 55.) We disagree.
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his *15 duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the veniremen could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. `A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Crim. App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."
"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'"
Dallas v. State, 711 So.2d 1101, 1107 (Ala. Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998), quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Crim. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
During individual voir dire of B.O., the following took place:
"[Prosecutor]: You indicated you have a fixed opinion about the death penalty.
"[Prospective juror B.O.]: Yeah.
"[Prosecutor]: What is it?
"[Prospective juror B.O.]: The rich don't go. Never. The rich never go to the death penalty.
"[Prosecutor]: Okay.
"[Prospective juror B.O.]: That's a fixed Bible thing. The rich never go. The rich never go.
"[Prosecutor]: All right. Does that mean that you would, you're against the death penalty totally?
"[Prospective juror B.O.]: Well, God won't kill King David
"[Prosecutor]: Does that mean
"[Prospective juror B.O.]: I don't believe in killing
"[Prosecutor]: Does that mean
"[Prospective juror B.O.]:other people
"[Prosecutor]: Does that mean you're against the death penalty?
"[Prospective juror B.O.]: Yes, I'm against killing, I'm not going to be involved.
"[Prosecutor]: All right. Is there any consideration [sic] where you would consider the death penalty?
"[Prospective juror B.O.]: No, sir, I'm against killing. I'm not going to be involved.

*16 "[Prosecutor]: Is there any particular situation where you would consider the death penalty?
"[Prospective juror B.O.]: No, [be]cause mistakes have been made. Those are facts. Now, what happens if it was me? Or my child dead? We're sorry. No. I don't want no part in killing nobody because I don't think nobody's perfect.
"[Prosecutor]: Well, since you brought your child into it, let's suppose somebody did kill your child
"[Prospective juror B.O.]: I wouldn't, like I said, I still wouldn't kill that person. You know why? I was brought up that God handle that. And so far my values have been handled that way."
(R. 232-34.) In addition, in response to questioning by the prosecutor during voir dire of the entire venire, B.O. stated that he would not follow the instructions given by the trial court if he believed those instructions were morally wrong.
Considering B.O.'s repeated statements that he would not impose the death penalty under any circumstances, and his statement that he would disregard the trial court's instructions if he believed those instructions to be morally wrong, there is no doubt that B.O.'s opposition to the death penalty would have impaired his ability to follow the court's instructions and obey his oath as a juror. Thus, we find no abuse of the trial court's discretion in granting the State's challenge for cause as to prospective juror B.O.

III.
Johnson contends that the trial court erred in denying his challenges for cause as to prospective jurors K.F. and E.S., both of whom stated during voir dire that they were in favor of capital punishment. (Issue IV in Johnson's brief.) Specifically, Johnson claims that the statements made by K.F. and E.S. during voir dire demonstrated that they would vote to automatically impose the death penalty in all capital cases. See Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); and Martin v. State, 548 So.2d 488 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (potential jurors who indicate they would automatically vote for the death penalty for every eligible defendant must be excluded when challenged for cause).
While the record reflects that both K.F. and E.S. expressed strong support for capital punishment, the record also reflects that during voir dire both K.F. and E.S. stated that they could set aside their personal beliefs and render a verdict based on the evidence and the law. K.F. stated that she would consider both the death penalty and life imprisonment without parole as possible punishments; that she would vote for life imprisonment without parole if the evidence and the law dictated it; and that she could set aside her personal beliefs about capital punishment and render a verdict based on the law and the evidence. E.S. stated that he would consider both the death penalty and life imprisonment without parole as possible punishments; and that he would not vote for the death penalty in all cases, despite his personal beliefs about capital punishment.
"`[A] preference [toward imposing the death penalty], where the potential [juror] indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.
"`"[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. `A veniremember *17 who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id."
"`Smith v. State, 698 So.2d 189 (Ala. Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).' "Price v. State, 725 So.2d 1003, 1024 (Ala.Crim.App.1997)."
Hagood v. State, 777 So.2d 162, 175 (Ala. Crim.App.1998), rev'd on other grounds, 777 So.2d 214 (Ala.1999), on return to remand, 777 So.2d 221 (Ala.Crim.App.2000).
The trial court did not abuse its discretion in denying Johnson's challenges for cause as to prospective jurors K.F. and E.S.

IV.
Johnson contends that the State improperly used its peremptory strikes to discriminate on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Issue II in Johnson's brief.) Johnson maintains that he established a prima facie case of discrimination and that the trial court erred in not requiring the State to articulate race-neutral reasons for its strikes.
After the jury was struck, but before it was sworn, the following occurred:
"[Johnson's counsel]: Judge, we started out with a pool of 42 to strike from if you go ahead before we get to the 42 and discount those people who were struck for cause yesterday, and that's what I've done. You end up, out of the 42 remaining veniremembers, with all of them being white except five black males: [F.R.], 584, [C.W.], 657, [E.R.], 594, [C.B.], 366, and [C.H.], 479. And we had four black females, [C.B.], 391, [T.J.], 491, [A.W.], 664, and [F.W.], 659.
"That meant we started out with a 21 percent pool of black veniremembers. The defense struck one, we struck [C.W.], number 657, who is a police officer. We struck him because he's a police officer and because of the fact that this capital murder which we are defending is the capital murder of a police officer. We didn't care whether he was white or green or yellow or blue, he was a policeman, so we struck him. Turned out he was one of our nine black people.
"The State of Alabama struck number 391, [C.B.], a black female. They struck number 664, [A.W.], a black female. They struck number 366, [C.B.], a black male. They struck number 659, [F.W.], a black female. And they struck number 584, [F.R.], a black male. And they struck number 479, [C.H.], a black male. Leaving [E.R.], number 594, and [T.J.], number 491 as the only black people on the jury. And that still leaves us with one strike remaining so that we might pick alternates.
"I believe if we just take the two who are remaining, two divided by twelve equalsthat would be, if those two remain on there and neither is struck as an alternate, we would end up with a 16 percent black population on the jury.
"The problem's not only with numbers, however. The strikes which the State made on [F.R.], for instance, number 584, [F.R.] said nothing whatsoever yesterday to give anybody, either the State or the defense, a reason to strike him, and other than the fact that he is black and this defendant is black, I see no reason for it.

*18 "I've explained our strike of 657, [C.W.] because he's a police officer, has nothing to do with his race.
"[C.B.], number 366, who the State struck, he's a roofer, he lives in West End and he's single. I guess if they're striking everybody that's single, then that would be an articulable reason to strike him, but otherwise I can't imagine what would be, although I would suggest to the Court that there are other single people who have been left on the jury.
"[C.H.], number 479, gave no reason whatsoever to be struck. As a matter of fact, his brother ... is a Birmingham police officer, which might give some indication that the defense might want to strike him, but I can't for the life of me understand why the State would, other than it's because of the fact that he's black.
"Number 391, [C.B.], she was struck by the State. The only thing I can see in her particular situation is the fact that she was on a jury once before on a murder case and it ended up being a hung jury. Other than that, I can't see any reason to strike her.
"Same goes for [A.W.], number 654, who the State struck664, pardon me, I gave the wrong number. She's a social worker here in Birmingham, her husband's a postman, she's been working at her job, the same job, for over five years, she was the victim of a car theft at one point. That's about all she told us, none of which is a reason to strike her.
"[F.W.], number 659, was our first alternate after we had had several people struck for cause, and several of those, I might add, who were struck for cause, rightfully, were struck because they didn't believe in the death penalty, and, as usual, a higher number of those were black than w[ere] white. But we lose those, anyway, so that has nothing to do with this motion.
"But the first person we got as an alternate was [F.W.] She lives in College Hills, she's a nursing assistant, she's been the victim of a burglary, she's been at her job for over five years. I believe it saysI'm having a hard time reading my writingthat she has two cousins who are police officers. I see no reason whatsoever for her to have been struck other than the fact that she is a black woman and this defendant is a black man.
"I would suggest to the Court that starting out with nine members, nine black members of a 42-member venire, and ending up with two, six of which were struck by the State, plus the reasons that I've set out does, in fact, make out a case for racially-motivated strikes, and I would ask that these members of the venire be placed back on the jury and we strike again.
"[The Court]: Any other motions?
"[Johnson's counsel]: No, sir.
"[The Court]: Or grounds?
"[Johnson's counsel]: No, sir.
"[The Court]: I do not find that you make a prima facie case for racial discrimination in violation of Batson or any of its progeny, and I make my ruling based not only on the motion and grounds that you asserted, but also on the responses of these jurors that I heard in the courtroom during voir dire."
(R. 282-88.)
Initially, we note that the record does not contain any documents that show the race of the prospective jurors on the venire or of the members of the jury itself. The jury strike list is not in the record, nor is the striking of the jury included in the trial transcript. Moreover, the record *19 suggests that jury questionnaires were completed by the prospective jurors,[2] but those, too, are absent from the record. Other than defense counsel's assertions in support of the Batson motion, there is simply no evidence in the record of the race of prospective jurors on the venire, of which prospective jurors were struck by the State and which were struck by the defense, or even of the identity or race of the jurors who ultimately sat on Johnson's jury. "It is the appellant's duty to provide this Court with a complete record on appeal." Knight v. State, 621 So.2d 394, 395 (Ala.Crim.App.1993). "`Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.'" Owens v. State, 597 So.2d 734, 736 (Ala.Crim.App.1992), quoting Jolly v. State, 405 So.2d 76, 77 (Ala.Crim.App.1981). "This court will not presume error from a silent record." Frazier v. State, 758 So.2d 577, 600 (Ala.Crim. App.), aff'd, 758 So.2d 611 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000). See also Roberts v. State, 627 So.2d 1114, 1116 (Ala.Crim.App. 1993).
Nevertheless, even assuming that defense counsel's assertions in support of the Batson motion are truei.e., that the State did strike juror nos. 391, 664, 366, 659, 584, and 479, and that all of those jurors were indeed blackwe would still uphold the trial court's ruling that Johnson failed to establish a prima facie case of racial discrimination.
"In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch, 526 So.2d 609, 622-623 (Ala.1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor's questions during voir dire, including desultory voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike blacks; and the use of peremptory challenges to dismiss all or most black jurors."
Madison v. State, 718 So.2d 90, 101-102 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998).
Johnson offered no evidence, other than statistics and his counsel's opinion that no valid reasons for striking these jurors were revealed during voir dire, to show that the prosecutor exercised his strikes in a discriminatory manner. See, e.g., Duncan *20 v. State, [Ms. CR-95-1544, September 17, 1999] ___ So.2d ___, ___ (Ala.Crim. App.1999), aff'd, [Ms. 1990652, March 30, 2001] ___ So.2d ___ (Ala.2001) (Batson motion in which counsel asserted only statistics and his opinion that nothing was revealed during voir dire to provide a legitimate reason for the strikes held insufficient to satisfy defendant's burden of proving a prima facie case). Johnson did not offer evidence, nor even allege, that the struck veniremembers shared only the characteristic of race, that there was a lack of meaningful voir dire directed at black veniremembers, that black and white veniremembers were treated differently, or that the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers. Johnson noted only that the State used 6 (less than half of its 14) strikes to remove 6 of the 9 blacks from the venire, and that, in his counsel's opinion, no articulable reason for the strikes was revealed during voir dire. We do not find the statistics or defense counsel's assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination. "A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous." Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996). "`[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989), quoting Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989), quoting, in turn, Anderson v. City of Bessemer, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Based on the scant record before us, we simply cannot say with a "definite and firm conviction" that the trial court erred in finding that Johnson did not establish a prima facie case of racial discrimination.
We note that, contrary to Johnson's assertions at trial and on appeal, a review of voir dire reveals valid race-neutral reasons for striking at least three of the six jurors allegedly struck by the State, specifically, juror nos. 391, 659, and 479. During voir dire, juror nos. 391 and 479 expressed strong opposition to the death penalty and expressed doubt as to their ability to set aside those deep-seated personal beliefs; juror no. 659 stated that she had previously served on a criminal jury that had returned a not-guilty verdict. Clearly, the trial court took these facts into consideration when finding, based "on the responses of the[ ] jurors," that Johnson had failed to establish a prima facie case of racial discrimination. We also note that, although the transcript of voir dire does not suggest reasons for striking juror nos. 664, 366, and 584, as it does for the other jurors, as stated above, Johnson failed to include a complete record on appeal. The record does not contain the juror questionnaires that were apparently completed by prospective jurors. More importantly, however, the transcript of voir dire fails to reveal the jurors who answered affirmatively the prosecutor's question regarding prior arrests; rather than including the names of those people who indicated that they had been arrested, the transcript merely states: "Show of hands." (R. 57.) Neither defense counsel nor the prosecutor attempted to have the names of those jurors who answered affirmatively included in the record. While we cannot presume that valid race-neutral reasons for peremptory strikes are present outside the record, we likewise cannot presume that there are no valid race-neutral reasons *21 when the record is incomplete on the issue. Because there is simply nothing in the record before us suggesting that the State used its strikes in a discriminatory manner, we cannot say that the trial court's ruling on Johnson's Batson motion was clearly erroneous.
On appeal, Johnson contends for the first time that a prima facie case of racial discrimination existed because, he says, the six black jurors who were allegedly struck by the State shared characteristics with white jurors who were not struck. Because Johnson did not argue this point to the trial court, we may review it only for plain error. See Rule 45A, Ala.R.App.P. As stated above, the record does not contain any documents indicating the race of prospective jurors, and it does not contain a jury strike list. In addition, the striking of the jury is not included in the trial transcript. We, therefore, have no way of knowing whether the State did not, in fact, strike white jurors who had the same characteristics as the black jurors who were allegedly struck. Simply put, we have no way of verifying Johnson's assertion in his brief. In addressing a similar issue in Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994), we stated:
"There is no evidence in the record that the prosecutor used his strikes in a racially discriminatory manner. There is no indication of the racial composition of the jury, though a jury strike list is contained in the record. Neither do we know whether any minorities in fact served on the jury. The record simply does not support an inference of plain error on the alleged Batson violation. Our Supreme Court in Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), refused to find plain error in a similar situation. It stated:
"`The record as a whole simply does not raise an inference that the state engaged in the practice of purposeful discrimination. Under the plain error rule this Court will "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." ... The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks).'
"509 So.2d at 1076-77. See Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)(stating that there was no evidence in the record to support the contention that the State of Alabama used its peremptory strikes to exclude blacks from the jury). `Under the circumstances of this case, we cannot conclude that a prima facie case of purposeful discrimination has been established.' Pierce [v. State], 576 So.2d [236,] 242 [(Ala.Crim.App.1990), cert. denied, 576 So.2d 258 (Ala.1991)]."
627 So.2d at 1042.
Similarly, under the circumstances here, we simply cannot conclude that a prima facie case of racial discrimination has been established or that the trial court erred in denying Johnson's Batson motion. Accordingly, we find no error, plain or otherwise, as to this claim.

*22 V.
Johnson contends that the trial court erred in allowing the courtroom to be "filled with uniformed law-enforcement officers" during his trial because, he says, the presence of uniformed officers in a trial for the murder of a law-enforcement officer created a "hostile environment," which denied him a fair and impartial trial. (Issue X in Johnson's brief at p. 68.) Because Johnson did not object to this allegedly "hostile environment," we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
We have searched the record and can find no indication that any uniformed law-enforcement officers were present in the courtroom during Johnson's trial, much less that the courtroom was "filled" with such officers, as Johnson contends. The only indication that uniformed officers were present during trial is Johnson's assertion in his brief to this Court. However, this Court is bound by the record on appeal; an appellate court "`may only consider the facts contained in the record on appeal, and it may not presume any facts not shown by that record and make them a ground for reversal.'" Pressley v. State, 770 So.2d 115, 123 (Ala.Crim.App. 1999), aff'd, 770 So.2d 143 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000), quoting Carden v. State, 621 So.2d 342, 346-47 (Ala.Crim. App.1992).
"`"This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record." Smelcher v. State, 520 So.2d 229 (Ala.Crim.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Crim.App.1986). "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." Jolly v. State, 405 So.2d 76 (Ala.Crim.App.1981); Watson v. State, 398 So.2d 320 (Ala.Crim.App. 1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).'"
Gaddy v. State, 698 So.2d 1100, 1130 (Ala. Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997), quoting Owens v. State, 597 So.2d 734, 736 (Ala. Crim.App.1992). See also Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000); and Perkins v. State, 808 So.2d 1041 (Ala.Crim. App.1999), aff'd, 808 So.2d 1143 (Ala.2001). "We will not hold a trial court in error based on the bare, unsupported speculations asserted in an appellant's brief." Pressley, supra, at 123. Therefore, we find no error, much less plain error, as to this claim.[3]

VI.
Johnson contends that the prosecutor improperly pursued inconsistent theories of prosecution. (Issue IX in Johnson's brief.) Specifically, Johnson claims that his due-process rights were violated when the prosecutor argued during his trial that he had shot Deputy Hardy and *23 then, Johnson says, argued at Ardragus Ford's trial that Ford had shot Deputy Hardy. Johnson raises this issue for the first time on appeal; therefore, we may review it only for plain error. See Rule 45A, Ala.R.App.P.
There is no evidence in the record before this Court that the prosecutor argued a different theory of the murder at Ford's trial. In fact, the record in Johnson's case does not even reveal that Ford was ever tried for the murder of Deputy Hardy, much less that the prosecutor tried Ford on the theory that Ford was the triggerman.
"Without any evidence in the record on appeal to support the allegation of error, this court cannot consider the alleged error even under the `plain error' doctrine of Rule 45A, [Ala.R.App.P.] `The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.' Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
"`Even though ... this Court [is] required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found, ... this Court will [not] presume that reversible error occurred at trial when there is nothing in the record to so indicate....'"
"Ex parte Godbolt, 546 So.2d 991, 998 (Ala.1987)."
Kuenzel v. State, 577 So.2d 474, 482 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). We find no error, much less plain error, as to this claim.[4]

VII.
Johnson contends that the trial court erred in admitting into evidence a tape recording of the two emergency 911 calls placed by Barry Rushakoff, the night manager of the hotel, on the night of the murder. (Issue XXI in Johnson's brief.) Specifically, Johnson contends that the tape was not properly authenticated because, he says, it contained several voices in the background that were never identified. According to Johnson, "[t]here is a requirement that before an audio tape can be played, there must be an authentication as to the voices on the tape, and of the circumstance[s] of the making of the tape... [that] was not done in this case." (Johnson's brief at p. 85.) Because Johnson did not object to the admission of the tape, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"The proper foundation required for the admission of a sound recording into evidence depends on the circumstances of the case in which the admission is sought." Smith v. State, 727 So.2d 147, 167 (Ala. Crim.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999). In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court set out the two alternative methods of laying a foundation for the admissibility of sound recordings:
"The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, *24 motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the `silent witness' foundation must be laid. Under the `silent witness' theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the `silent witness' theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.), cert. denied, 387 So.2d 256 (Ala.1980)] test. Rewritten to have more general application, the Voudrie standard requires:
"(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
"(2) a showing that the operator of the device or process or mechanism was competent,
"(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
"(4) a showing that no changes, additions, or deletions have been made,
"(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
"(6) identification of the speakers, or persons pictured, and
"(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
"On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the `pictorial communication' theory. Under this theory, the party offering the item must present sufficient evidence to meet the `reliable representation' standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds."
620 So.2d at 678.
Here, the State presented sufficient evidence of the authenticity of the tape recording of the 911 calls. Barry Rushakoff testified that he had listened to the tape of the two 911 calls that he placed the night of the murder and that the tape was an accurate representation of what had transpired during those calls. Although Rushakoff did not identify all of the voices that can be heard in the background of the tape, positive identification of every sound on a tape recording is not necessary for its admission. See, e.g., Molina v. State, 533 So.2d 701, 711 (Ala.Crim. App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (holding that videotape of defendant placing telephone call while being "booked" at the police station was properly admitted even though witness could not verify every word that the defendant spoke as one he personally heard; as long as "portions" of video and/or sound recordings are verified by a witness, the recordings are admissible). Rule 901(a), Ala.R.Evid., states that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its *25 proponent claims." Testimony of a witness with knowledge that the matter "is what it is claimed to be" is sufficient authentication to warrant admission. Rule 901(b)(1), Ala.R.Evid. Under the "pictorial communication" theory, Rushakoff's testimony was sufficient to authenticate the tape recording of the 911 calls. Any unidentified sounds or voices on the tape recording affected the weight and credibility of the tape, not its admissibility. Therefore, we find no error, plain or otherwise, in the admission of the tape recording of the 911 calls.

VIII.
Johnson contends that the trial court improperly "intimidated" a prosecution witness so that she would testify favorably for the State. (Issue V in Johnson's brief at p. 58.) Because Johnson did not object to this alleged intimidation during trial, we review this claim under the plain-error rule. See Rule 45A, Ala. R.App.P.
The record reflects that on the morning of the third day of trial, the following occurred outside the presence of the jury:
"[The Court]: All right. Go ahead, [prosecutor].
"[Prosecutor Wallace]: Your Honor, in the case of the State versus Latanya Henderson, presently charged with hindering prosecution in connection with the murder of Deputy Hardy, the State wants to secure her testimony, and in that regard we are dismissing her hindering prosecution case and asking the Court to issue a subpoena instanter for her in the ToForest Johnson case.
"[Defense counsel]: Might I inquire as to whether the State has any knowledge as to whether she has changed her version of what happened? She did give a statement early on. Do you anticipate her to testify the way her statement went, or is she going to testify otherwise?
"[Prosecutor Lawson]: We have not talked to her.
"[Prosecutor Wallace]: We anticipate that she'll testify as she, in the same fashion of the statement that she gave to the police.
"[Defense counsel]: I ask, [be]cause I'd like not to be surprised if I can avoid it.
"[The Court]: Go ahead and bring her in. When are you going to use her?
"[Prosecutor Wallace]: Judge, it will be fairly soon this morning.
"(Attorney John Robbins and Latanya Henderson present.)
"[The Court]: Has your lawyer already gone over with you what's going on?
"[Mr. Robbins]: No, Judge, I have not. She's, when I got here she wasn't here and I'm just, I just formally found out that that's exactly what they're going to do. So she doesn't know.
"[The Court]: Miss Henderson, basically your lawyer can go over it in greater detail with youthe State is moving to dismiss the charges against you, the hindering prosecution charge. They anticipate calling you as a witness in this case. All right?
"What I'm doing, and the reason I'm calling you in here is ordering you to remain in the witness room, I anticipate that you'll be called sometime today, probably this morning, to testify and I want you to stay out there in the witness room and cooperate with the State and the defense, if the defense needs to talk to you. Be present in case you are recalled after that. Now, once you're released from here, not knowing whether you'll be recalled or not, I want you to be in touch with your attorney so that he can reach you in the event that you *26 are recalled. I'm doing that in order for it to be as little inconvenience as possible.
"[Mr. Robbins]: And the charges are now dismissed against her with prejudice?
"[The Court]: No, it's not going to be with prejudice, because if there's some type of breakdown or sabotage, the State would move to reinstate the charges [a]t this point. Now, after this case is over with I would entertain a motion to make it with prejudice.
"[Mr. Robbins]: Okay.
"[The Court]: Thank you very much.
"(Mr. Robbins and Ms. Henderson leave the courtroom.)
"[The Court]: Ready to go? Let's bring the jury in."
(R. 516-20.)
Johnson maintains that this exchange shows that "[t]he trial court acted to intimidate the witness, which served the purpose of having the witness understand that she was to testify in a way that was favorable to the State and harmful to the defendant; and that is what the [witness] did." (Johnson's brief at p. 58.) According to Johnson, the trial court's refusal to dismiss the charge against Henderson with prejudice before Henderson testified effectively "purchased" Henderson's testimony because, he says, Henderson knew that if she did not testify favorably for the State, the State would reinstate the charge against her. (Johnson's reply brief at p. 19.) We disagree.
Contrary to Johnson's contention, the trial court's actions did not amount to witness intimidation. Although the trial court refused to dismiss the charge against Henderson with prejudice before her testimony, this was to ensure that Henderson would live up to her end of the bargain with the State, not to intimidate Henderson into testifying a certain way. The State had agreed to dismiss the hindering-prosecution charge against Henderson on the condition that Henderson testify at Johnson's trial. Had the trial court dismissed the charge against Henderson with prejudice before Henderson was actually called to testify, Henderson could have refused to testify when she was called, and the State would have had no recourse. The trial court's refusal to dismiss the charge against Henderson with prejudice before Henderson took the stand merely ensured that Henderson would testify as she had agreed to do in exchange for the dismissal of the hindering-prosecution charge. The trial court made it clear that it would grant a motion to make the dismissal with prejudice after Henderson testified. The trial court in no way stated, suggested, or implied that it would refuse to make the dismissal with prejudice if Henderson did not testify favorably for the State. We do not believe that the dismissal without prejudice before her testimony had the effect of intimidating Henderson into testifying favorably for the State. In fact, Johnson's counsel's cross-examination of Henderson revealed that Henderson's testimony at trial was substantially the same as the statement she had given to police shortly after Deputy Hardy's murder and before any charge had been brought against her. Clearly, the trial court's refusal to dismiss the charge with prejudice had no impact whatsoever on Henderson's testimony. Accordingly, we find no error, plain or otherwise, as to this claim.

IX.
Johnson contends that the trial court erred in permitting the testimony of Katrina and Violet Ellison regarding several telephone calls Johnson had placed to various individuals from the Jefferson County jail. (Issue I in Johnson's brief.) The *27 record reflects that Johnson filed a pretrial motion in limine to exclude any testimony regarding these telephone calls on the ground that the calls were not authenticated as required by Rule 901, Ala.R.Evid. A hearing was held on the motion and the trial court subsequently denied the motion.[5]
At the hearing and at trial, Katrina Ellison (hereinafter "Katrina"), who was 16 years old at the time of Deputy Hardy's murder and 19 years old at the time of trial, testified that during the summer of 1995, she placed numerous "three-way" telephone calls for several inmates at the Jefferson County jail. Testimony showed that the inmates at the jail had unlimited access to a pay telephone. To avoid paying for each individual telephone call, the inmates would telephone one person who had "three-way" calling service and that person would then place one or more calls to other numbers. This allowed the inmates to speak with several different people, while paying only for one telephone call.
Katrina testified that a friend of hers, Jeremy Roper, was incarcerated in the Jefferson County jail in the summer of 1995. During that time, Katrina said, Roper often telephoned her from the jail. Katrina testified that, at one point, Roper asked her to make a "three-way" telephone call for a man named Fred Carter, another inmate in the jail. According to Katrina, she made the call for Carter and then made several more calls for Carter. Eventually, Katrina said, Carter asked her, on August 3, 1995, to make a "three-way" call for a friend of his who was also in the jail, a friend Carter identified as "his homeboy named ToForest." (R. 522.) Katrina testified that after she agreed to make the telephone call, a male voice came on the line. Katrina stated that the man identified himself as "ToForest." (R. 651.) Katrina testified that she placed the "three-way" telephone call for "ToForest" and several more over the next several days. Katrina stated that when she made the calls for "ToForest," Carter always telephoned her and then put "ToForest" on the line, but that "ToForest" never telephoned her directly. In addition, Katrina testified that "ToForest" identified himself during the second call, just as he had during the first call, but that he did not identify himself during any of the subsequent calls. Katrina said, however, that by the third call, she had learned the sound of "ToForest's" voice and knew it was the same person who had previously identified himself as "ToForest."
Fred Carter corroborated Katrina's testimony regarding the telephone calls placed by Johnson. Carter testified that in August 1995, he was incarcerated in the Jefferson County jail. Carter stated that his friend Jeremy Roper introduced him to a girl named Katrina over the telephone. According to Carter, Katrina often made "three-way" telephone calls for him. Carter stated that after the first few calls, Roper gave him Katrina's telephone number and he began telephoning her directly. Carter further testified that he had Katrina make "one or two" "three-way" telephone calls for ToForest Johnson, who was also incarcerated in the county jail. (R. *28 606.) Carter positively identified Johnson as the man for whom he asked Katrina to make the telephone calls.
Katrina testified that when she made the "three-way" calls for Carter and "ToForest," she always laid the telephone down and left the room. According to Katrina, just before the first telephone call she placed for "ToForest" on August 3, 1995, her mother discovered what she was doing and began listening to the conversations, beginning with the first telephone call she made for "ToForest."
Katrina stated that the first "three-way" telephone call she had made for "ToForest," on August 3, 1995, was placed to a woman named Daisy and that after she heard Daisy come on the line, she laid the telephone down on her bed and went into another room. When she returned to her room a few minutes later, Katrina said, she saw her mother laying the telephone down on her bed. Katrina testified that she then picked the telephone up to hang up and she heard "ToForest" say that "somebody needed to get in touch with Yolanda to shut her up ... [b]ecause she was talking too much." (R. 658-59.) Katrina testified that she had not told her mother before she made the call for "ToForest," but that her mother must have seen the telephone lying on her bed and picked it up to listen.
Katrina testified that she placed a second "three-way" telephone call for "ToForest" on August 4, 1995, to a woman named "Toni." According to Katrina, her mother knew she was making this second call and she handed the telephone to her mother after making the connection. When the call was over, Katrina said, her mother gave the telephone back to her. Katrina testified that she made a third call for "ToForest" on August 9, 1995. Katrina stated that this call was placed to a man (she could not remember his name) and that after she made the connection, she again handed the telephone to her mother to listen. Katrina testified that she received a fourth call from "ToForest" on August 11, 1995, but that she did not make a "three-way" connection. According to Katrina, he spoke with her about her friends. On August 12, 1995, Katrina said, she placed a another "three-way" call for "ToForest," this time to "ToForest's" mother, and that her mother again listened to the conversation.
Violet Ellison, Katrina's mother, testified that she was generally a "nosy" person and that when the telephone would ring and she heard her daughter talking, she would often ask her daughter with whom she was speaking. (R. 669.) During the summer of 1995, Ellison said, her daughter told her that she had been placing "three-way" telephone calls for inmates in the Jefferson County jail. On August 2, 1995,[6] Ellison said, she instructed Katrina not to make any more "three-way" calls for inmates, and she warned Katrina that if any more calls were made, she would listen in on the conversations. On August 3, 1995, Ellison said, she saw Katrina lay the telephone down on her bed and leave the room. Ellison testified that she then went into Katrina's room and picked up the telephone. Ellison stated that she listened to the conversation and took notes about what was said.
When she picked up the telephone during this first call, Ellison said, she heard a male voice identify himself as "ToForest." (R. 682.) According to Ellison, the voice was explaining to a woman named Daisy about an incident in a hotel parking lot. Ellison testified that the voice said that a man named Michael Ansley was supposed *29 to have been robbed and that he (the voice) had followed Ansley to a motel and saw Ansley switch from a red Blazer sport utility vehicle to a gold Blazer.[7] The voice further stated that after Ansley had switched cars, they stayed in the parking lot of the hotel and waited. The voice said that the "bitch" of Ansley's then came and pulled out a gun. (R. 683.) The voice stated that an argument ensued and that an officer came out of the hotel because of the "disturbance"the voice said that the officer had heard and seen them in the parking lot. (R. 683.) When the officer came out, the voice said, "Fellow" shot the officer one time. (R. 683.) The voice further stated that after "Fellow" shot the officer, he (the voice) then shot the officer. Ellison testified that the voice said: "I shot the fucker in the head and I saw his head go back and he fell" and "[h]e shouldn't have got in my business, messin' up my shit." (R. 683-84.) Ellison also testified that the voice said that "Dray" was in the car when the shooting occurred and that nobody saw him because, the voice continued, he had gone into the front of the hotel. Ellison also heard the voice state that "the other men" had gone to a motel after the shooting and had "rode around for some girls." (R. 684.) According to Ellison, the voice also stated that he was a "pimp" and that that was why "they" weren't showing his picture on television and that "they d[idn't] have anything on him." (R. 684.) Ellison testified that the female voice on the line, Daisy, then warned the male voice that he was on a "three-way" line and that he "better be careful" about what he said. (R. 684.) According to Ellison, the male voice then said that he did not want to use up all of his "homeboy's airtime" and that he would call the female later. (R. 684.) At this point, Ellison said, she laid the telephone back down on the bed and told her daughter to pick the telephone back up.
Ellison testified that on August 4, 1995, she listened to another telephone call her daughter received from the jail. Ellison stated that when the call came in and after her daughter had made the "three-way" connection, her daughter either handed her the telephone or she picked up the telephone herself (she could not remember which one). Ellison testified that she heard the same male voice she had heard on August 3, 1995, speaking to a girl named "Toni." Ellison said that she heard the voice say that "they" didn't have anything on him and that he would be out soon. (R. 686.)
On August 9, 1995, Ellison said, she listened to a third telephone call from a caller with the same male voice as the first two calls. Ellison testified that she was present when this call came in and that Katrina answered the telephone. Ellison stated that after Katrina had made the "three-way" connection, she picked up the telephone and listened to the conversation. According to Ellison, during this call the voice was talking to another male. Ellison testified as follows regarding this conversation:
"He said, when he first got on the phone he said, `What's up?' And he was telling the guy that the old man is Michael Ansley's stepfather, and that somebody named Mama Mary is the 411. And he was asking this man to call someone by the name of Christi. And he said that Yolanda was talking too much. And he gave this number for Christi, gave this man a number for Christi."
(R. 690.)
On August 11, 1995, Ellison said, she picked up an extension in her home and *30 heard the same male voice speaking with Katrina; the voice was asking Katrina about her friends.
Ellison testified that on August 12, 1995, she listened to a fifth call from the same male voice. Ellison stated the following regarding the content of that conversation:
"[W]hen he first answered the phone he said `Hi, cuz,' there was a man on the phone. He said, `Hi, cuz,' and this man was telling him that his mother was in the process of moving. And that's when ToForest said that Ken Daniel['s] sister['s] name was Monika, and she was Michael's girlfriend. And he gave a number. He said, `She knows a lot.' And Monika, he gave her number and he gave her grandmother's number."
(R. 692.)
Ellison testified that after the second telephone call, on August 4, she contacted the police about the calls. Ellison testified that she contacted the police because she had heard about Deputy Hardy's murder on the news and she was afraid the telephone calls had something to do with his murder. According to Ellison, she went to the sheriff's department on August 9 (before the August 9 telephone call) and gave the police a copy of her notes from the August 3 and August 4 telephone calls. Ellison met with police again on September 20, 1995, she said, and she gave the police her notes on the August 9, August 11, and August 12, telephone calls.
Johnson makes three arguments regarding the admissibility of the telephone conversations. We address each in turn.

A.
First, Johnson contends that the telephone conversations were inadmissible because, he says, the State did not properly authenticate the conversations. Specifically, Johnson maintains that the State failed to present sufficient evidence identifying him as the caller pursuant to Rules 901(b)(5) and (b)(6), Ala.R.Evid.
Rule 901(a), Ala.R.Evid., provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) lists several examples of how different pieces of evidence can be authenticated as required by Rule 901(a). Rules 901(b)(5) and (b)(6) include the following examples of authentication:
"(5) Voice Identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.
"(6) Telephone Conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone."
We agree with Johnson that the State did not satisfy the means set out in Rules 901(b)(5) and (b)(6). However, contrary to Johnson's contention, the list in Rule 901(b) is not exhaustive. Rule 901(b) expressly states that the list is "[b]y way of illustration only, and not by way of limitation." In addition, the committee comments to the rule state that the list "is not intended to be exclusive; rather, it is meant to guide in application of the general rule and is intended to leave `room for growth and development in this area of the *31 law.'" Quoting the advisory committee's notes to Fed.R.Evid. 901(b). Although Rule 901(b) provides two methods of properly authenticating a telephone conversation, they are not the only methods available for such authentication.
It is well settled that "[i]n order to introduce evidence of a telephone conversation to establish the content of the conversation, the identity of the speaker must be satisfactorily established." Avon-Avalon, Inc. v. Collins, 643 So.2d 570, 572 (Ala.1994). "Identity may be established by either direct or circumstantial evidence." Vaughn v. State, 57 Ala.App. 134, 136-37, 326 So.2d 662, 664 (Ala.Crim.App. 1976). See also Dentman v. State, 267 Ala. 123, 99 So.2d 50 (Ala.1957); Chisler v. State, 553 So.2d 654 (Ala.Crim.App.1989), cert. denied, 495 U.S. 961, 110 S.Ct. 2572, 109 L.Ed.2d 753 (1990); and St. John v. State, 523 So.2d 521 (Ala.Crim.App.1987). Even when the recipient of the call cannot identify the voice of the caller, other circumstantial evidence may nevertheless be sufficient to identify the caller. See, e.g., State v. Hahn, 37 S.W.3d 344, 354 (Mo.Ct. App.2001) ("circumstantial evidence can be used to show the identity of the caller even though the recipient of the call cannot identify the voice"); and Commonwealth v. Anderson, 404 Mass. 767, 770, 537 N.E.2d 146, 148 (1989) ("A telephone conversation between a witness and a person the witness had never met may be admitted when confirming circumstances tend to authenticate the identity of the other person, even if ... the witness does not recognize the voice."). Other circumstantial evidence that may be sufficient to identify a caller may include, but is not limited to, the context and timing of the telephone call, the content of the conversation itself, the caller's knowledge of facts and circumstances only a particular person or persons would be likely to know, or any other distinctive characteristics of the conversation or of the caller. See, e.g., State v. Berger, 249 Conn. 218, 233-34, 733 A.2d 156, 167 (1999) ("Communications offered over the telephone may be authenticated by circumstantial evidence, if the party calling, in addition to stating his identity, relates facts and circumstances that, taken with other established facts, tend to reveal his identity."); Jernigan v. State, 612 N.E.2d 609, 611-12 (Ind.Ct.App.1993) ("Evidence a caller possessed knowledge of certain facts only a particular person would be likely to know can be sufficient authentication."); State v. Roybal, 107 N.M. 309, 311, 756 P.2d 1204, 1206 (N.M.Ct.App.1988) ("The caller's message itself during the telephone conversation may provide evidence of the caller's identity."); and State v. Nickles, 728 P.2d 123, 128 (Utah 1986) ("if the party calling, in addition to a statement of his identity, relates facts and circumstances which, taken with other established facts, tends to reveal his identity, the conversation is admissible"). See also United States v. Dhinsa, 243 F.3d 635 (2d Cir.2001); United States v. Garrison, 168 F.3d 1089 (8th Cir.1999); United States v. Orozco-Santillan, 903 F.2d 1262 (9th Cir.1990); United States v. Puerta Restrepo, 814 F.2d 1236 (7th Cir.1987); and United States v. Leon, 679 F.2d 534 (5th Cir.1982).
Here, the State presented sufficient circumstantial evidence to identify Johnson as the person who placed the telephone calls from the Jefferson County jail. At the hearing on Johnson's motion in limine, the State introduced into evidence telephone records indicating telephone calls had been placed in August 1995 from Block B of the Jefferson County jail to the telephone number assigned to Violet Ellison. The State also presented evidence that Johnson was an inmate at the Jefferson County jail, housed in Block B, in August 1995. At trial, Fred Carter positively *32 identified Johnson as the man for whom he had asked Katrina to make "three-way" telephone calls in August 1995. During the August 3, 1995, telephone call, Carter identified the caller as "his homeboy named ToForest." (R. 522.) The male voice who came on the line after Carter's introduction likewise identified himself as "ToForest." Both Katrina and Violet Ellison testified that the first telephone call was placed to a woman named Daisy. At trial, Daisy Williams, who testified on Johnson's behalf, testified that she had received a telephone call from Johnson sometime in August 1995 while Johnson was in the Jefferson County jail. Williams stated that the call initially came from her cousin, Fred Carter, who was on a "three-way" line, and that Carter later put Johnson on the line. The content of the telephone calls included facts and circumstances of the crime that only those present at the scene could know. During the conversations, the caller stated that "Yolanda" was "talking too much" and testimony indicated that "Yolanda" Chambers had been present when Deputy Hardy was killed. (R. 659.) Chambers herself testified that she was present when Deputy Hardy was killed and that Johnson was also present at the time of the murder. During the conversation on August 3, 1995, the caller stated that he had followed Michael Ansley to a hotel to rob Ansley and that he had seen Ansley switch from a red vehicle to a gold vehicle. Annie Colvin, a guest at the hotel on July 18-19, 1995, testified that her son, Michael Ansley, dropped off a gold Lexus at the hotel on the night of July 18-19 and switched to a red Lexus, leaving her the keys to the gold Lexus. Although circumstantial, this evidence was more than sufficient to establish Johnson as the caller; the calls were properly authenticated. Therefore, the trial court did not err in admitting the testimony of Violet and Katrina Ellison regarding the telephone calls.

B.
Second, Johnson contends that testimony regarding the telephone conversations was inadmissible because, he says, Katrina and Violet Ellison's interception of the conversations violated the Electronic Communications Privacy Act of 1986. See 18 U.S.C. §§ 2510 through 2521. Because Johnson did not object to Violet and Katrina Ellison's testimony on this ground at trialeither in his motion in limine or in his oral objections during trialwe may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The Electronic Communications Privacy Act of 1986, part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., prohibits the interception of wire, oral, and electronic communications without a warrant. "Intercept" is defined by 18 U.S.C. § 2510(4) as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." The Act provides for both criminal and civil penalties, 18 U.S.C. § 2511(4) and (5), and includes an exclusionary rule: illegally intercepted communications may not be introduced as evidence in any trial or hearing. See 18 U.S.C. § 2515. The Act also contains a consent exception, 18 U.S.C. § 2511(2)(d), which provides:
"(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act *33 in violation of the Constitution or laws of the United States or of any State."
Katrina and Violet Ellison's alleged "interception" of the telephone calls placed by Johnson from the Jefferson County jail did not violate the Electronic Communications Privacy Act. Katrina's testimony regarding that portion of the August 3 conversation which she overheard was clearly admissible because Katrina was a party to the conversation under 18 U.S.C. § 2511(2)(d). "Party" is defined in Black's Law Dictionary 1144 (7th ed.1999), as "[o]ne who takes part in a transaction." Clearly, Katrina took part in the telephone calls from Johnson. Under 18 U.S.C. § 2511(2)(d) it is not a violation of the Act to intercept a wire, oral, or electronic communication "where such person is a party to the communication." Because Katrina was a party to the telephone calls, anything she heard during those calls did not violate the Electronic Communications Privacy Act; therefore, Katrina's testimony was admissible.
Violet Ellison's testimony regarding what she overheard during the telephone conversations was also admissible, under the consent exception. Under the consent exception, it is not a violation of the Act to intercept a wire, oral, or electronic communication "where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). It is clear from the testimony of both Katrina and Violet Ellison that Katrina consented to her mother's listening to the telephone conversations placed from the Jefferson County jail.
Katrina specifically testified that on August 4 and August 9, she handed the telephone to her mother after making the "three-way" connection for Johnson. By handing the telephone to her mother, Katrina expressly consented to her mother's listening to those conversations. Although on August 3, August 11, and August 12, Katrina did not hand the telephone to her mothertestimony showed that on August 3, Ellison picked up the telephone after Katrina had left the room; on August 11, Ellison listened on an extension telephone; and there was no testimony about how Ellison got the telephone on August 12 and, therefore, did not expressly consent to her mother's listening to those conversations, it is clear that Katrina's consent was implied. Implied consent is "inferred from one's conduct rather than from one's direct expression." Black's Law Dictionary 300 (7th ed.1999). Ellison testified that when she found out about the telephone calls Katrina was placing for the inmates, on August 2, 1995, she ordered Katrina to stop placing those calls and warned Katrina that she would listen in on any calls Katrina received from inmates at the jail from that point on. By accepting the calls on August 3, August 11, and August 12, knowing that her mother planned to listen to the conversations, Katrina implicitly consented to her mother's doing just that. See, e.g., Griggs-Ryan v. Smith, 904 F.2d 112, 117 (1st Cir.1990) (holding that tenant implicitly consented to landlord's monitoring of his telephone calls from landlord's telephone where landlord had previously told tenant that all calls from her telephone would be recorded). Because Katrina, a party to the telephone calls, consented, either directly or implicitly, to her mother listening to the calls, there was no violation of the Electronic Communications Privacy Act.

C.
Last, Johnson contends that the telephone conversations were inadmissible *34 because, he says, they were intercepted in violation of §§ 13A-11-30 and 13A-11-31, Ala.Code 1975, Alabama's criminal eavesdropping statutes. Again, because Johnson did not present this argument to the trial courteither in his motion in limine or in his oral objections during trialwe review this claim only for plain error. See Rule 45A, Ala.R.App.P.
Section 13A-11-31 provides that "[a] person commits the crime of criminal eavesdropping if he intentionally uses any device to eavesdrop, whether or not he is present at the time." Section 13A-11-30(1), defines "eavesdrop" as "[t]o overhear, record, amplify or transmit any part of the private communication of others without the consent of at least one of the persons engaged in the communication, except as otherwise provided by law." Because Katrina consented to her mother's listening in on the telephone conversations Johnson placed from jail (see Part IX.B. above), Violet Ellison's actions did not constitute criminal eavesdropping.
Moreover, even if Ellison's actions violated §§ 13A-11-30 and 13A-11-31, this would not operate to exclude Ellison's testimony regarding the conversations. In addressing a similar issue in Chandler v. State, 680 So.2d 1018 (Ala.Crim.App.1996), this Court stated:
"Furthermore, §§ 13A-11-30 and 13A-11-31 contain no exclusionary rule providing for the per se prohibition against use of evidence obtained in violation of the statutes. As the attorney general correctly points out in his brief to this court, the Fourth Amendment exclusionary rule does not require exclusion of illegally obtained evidence, but only that evidence that is found as a result of a violation of the Fourth Amendment. See Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Consequently, even if the interception in this case constituted criminal eavesdropping, which we do not hold that it does, the conversation intercepted would not be rendered inadmissible by that fact."
680 So.2d at 1026. Clearly then, Ellison's testimony regarding the telephone calls was admissible.

X.
Johnson contends that the trial court erred in allowing the State to introduce into evidence the notes Violet Ellison made about the telephone conversations she overheard. (Issues VI and XV in Johnson's brief.)
Ellison testified that when she first picked up the telephone to listen to the conversation on August 3, 1995, she heard Johnson (see Part IX.A. of this opinion wherein we hold that the State presented sufficient circumstantial evidence that Johnson was the caller) talking about an incident in a parking lot involving an officer. According to Ellison, she had heard about Deputy Hardy's murder in a parking lot of a hotel and when Johnson began talking about an incident in a parking lot involving an officer, she got her glasses, a piece of paper, and a pen and began taking notes about the conversation. Ellison stated that she took notes about each conversation she heard on August 3, August 4, August 9, August 11, and August 12. Ellison took the notes as she was listening to the conversations. She initially wrote on an envelope that was near the telephone (State's Exhibits 70 and 72); she then rewrote the notes on sheets of paper (State's Exhibits 69 and 71). During her direct testimony, Ellison referred to her notes when testifying about the details of the telephone conversations. Johnson did not object to Ellison's using her notes *35 during her direct testimony. However, when the prosecutor attempted to introduce the notes into evidence, Johnson's counsel objected on the ground that the notes were hearsay. The prosecutor then withdrew his offer to admit the notes.
On cross-examination of Ellison, the following occurred:
"[Johnson's counsel]: I want to refer you to your notes, the notes that were taken on the envelope, I don't know what number that is. You know what I'm talking about?
"[Ellison]: The Judge has them.
"[The Court]: You're asking about the first two notes?
"[Johnson's counsel]: Yes, sir.
"[The Court]: (Directed to the witness): Do you not recall these notes without looking at them?
"[Ellison]: I can remember, I mean, I could
"[The Court]: Do you recall what was in these notes without having to look at the notes?
"[Ellison]: Pretty much so.
"[Johnson's counsel]: Well, I can ask her a question, then, and if she needs to refresh her recollection, that will be fine. All right?
"[The Court]: Okay. I'm not trying to put you on the spot, I'm just trying to decide whether you need these notes to recall what happened, or whether you recall the details of what happened without
"[Ellison]: I recall them, but if I had my notes I could, you know, it would be a lot better.
"[Johnson's counsel]: I do not object to her having them right there in front of her so she can look at them.
"[The Court]: All right."
(R. 696-98.) Johnson's counsel then questioned Ellison extensively regarding her notes, specifically pointing out discrepancies between her testimony at trial about the conversations and her notes about the conversations.
After Johnson's counsel finished cross-examining Ellison, the State again moved to introduce the notes into evidence:
"[Prosecutor]: Your Honor, the State renews its motion to admit into evidence State's Exhibits Number 69 and 70, and cites the fact that on cross-examination counsel for the defense got the witness to directly quote from those, directly search the notes for words that were or were not there, and to even compare words in one set to the other set, making the notes, themselves, an issue, and we would move to admit them into evidence.
"[Johnson's counsel]: Same objection, Judge, they're hearsay, just like a police report, they're not admissible.
"[The Court]: I'll overrule. They're admissible. I'm satisfied this witness has an incomplete recollection of what's in the notes.
". . . .
"[The Court]: I don't have an offer of [Exhibits] 71 and 72 when you offered the notes. Are you offering all of them, or just
"[Prosecutor]: He did not make 71 and 72 an issue. We'll offer them.
"[Johnson's counsel]: Same objection.
"[The Court]: 71 and 72 are admitted."
(R. 718-20.)
First, Johnson contends that the notes were inadmissible because, he says, they were made after listening to telephone conversations in violation of the Electronic Communications Privacy Act and the Alabama criminal eavesdropping statutes. Johnson did not object on this *36 ground at trial; therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P. Because we have already determined, see Part IX of this opinion, that Violet Ellison's actions in listening to Johnson's telephone calls were not in violation of the Electronic Communications Privacy Act and that they did not constitute criminal eavesdropping, Johnson's argument in this regard is meritless.
Second, Johnson contends that the notes were inadmissible because, he says, they "came from nowhere and the trial court allowed [them] to become part of the evidence in the case." (Johnson's brief at p. 79.) Although not entirely clear, we construe this to be a claim that no foundation was laid for the admission of the notes, i.e., that the notes were not properly authenticated. Again, because Johnson did not object to the notes on this ground at trial, we review this claim only for plain error. See Rule 45A, Ala. R.App.P. During trial, Violet Ellison testified that she recognized the writing on the notes as her own, and that the notes, State's Exhibits 69, 70, 71, and 72 were, in fact, the notes she made while listening to the telephone conversations. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), Ala.R.Evid. Ellison's testimony identifying the notes as those she took while listening to the telephone conversations was sufficient authentication of the notes.
Finally, Johnson contends that the notes were inadmissible because, he says, they consisted solely of hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid. As Johnson's counsel correctly pointed out at trial, Ellison's notes are similar to a police report in the sense that they contain two "layers" of statements that must be considered in determining their admissibility. The first "layer" is Johnson's statements during the conversations. By definition, Johnson's statements are nonhearsay and, therefore, admissible. See Rule 801(d), Ala.R.Evid. (defining a party's own statement as nonhearsay). The second "layer" is Ellison's statements in the notes about what she heard during the telephone conversations. By definition, Ellison's statements in the notes are hearsaythey are out-of-court statements by Ellison offered into evidence to prove the truth of the matter asserted.
"`Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' Edward W. Cleary, McCormick on Evidence 584 (1972). Hearsay is not admissible except as provided by the Alabama Rules of Evidence or by other rules adopted by the Supreme Court of Alabama or by statute. Ala.R.Evid. 802. Hearsay is not admissible because it violates the right of confrontation and cross-examination guaranteed by the Sixth Amendment to the United States Constitution. To overcome the inability to confront a witness, a statement by an out-of-court declarant must bear an `adequate indicia of reliability.' Reliability can be inferred in a case where the evidence falls within a firmly rooted hearsay exception. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), quoting Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)." *37 James v. State, 723 So.2d 776, 779 (Ala. Crim.App.1998), cert. denied, 723 So.2d 786 (Ala.1998), appeal after remand, 788 So.2d 185 (Ala.Crim.App.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2005, 149 L.Ed.2d 1007 (2001).
The trial court admitted the notes into evidence under the "past recollection recorded" exception to the hearsay rule. This was error. Rule 803(5), Ala.R.Evid., defines "past recollection recorded" as follows:
"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."
The requirements for admission of a memorandum or record under the "past recollection recorded" exception to the hearsay rule are set out in C. Gamble, McElroy's Alabama Evidence, § 116.03(2) (5th ed.1996):
"A memorandum or record exhibited to a witness while the witness is on the stand and which purports to be a statement of a past event is admissible as evidence of the truth of the matter stated if the witness testifies that he now knows, or testifies to facts showing that he now knows, the following:
"(1) That the witness personally observed the event or facts referred to in the memorandum or record and that the memorandum or record was made or seen by the witness either contemporaneously with the event or when the witness' recollection of the event was fairly fresh. It is not essential, to benefit from past recollection recorded, that the witness shall have made the memorandum or record. The memorandum or record may have been made by another person if the witness saw it when the event recorded was fairly fresh in the witness' memory.
"(2) That the witness then knew the contents of the memorandum or record and knew such contents to be true and correct. Where the witness testifies that the memorandum or record is in his own handwriting, the witness may testify further that he knows from his general practice in making writings of that kind that what he wrote was true.
"(3) That the witness possesses insufficient recollection, other than the testimony to the matters stated in (1) and (2) above, to enable him to testify fully and accurately."
(Footnotes omitted.)
While Rule 803(5), Ala.R.Evid., liberalized the preexisting rule in Alabama under which a witness was required to have no recollection at all before a writing could be admitted under the "past recollection recorded" exception, to require only an insufficient recollection to testify fully and accurately, the record in this case simply does not demonstrate that Ellison had an insufficient recollection. Although Ellison referred to her notes during direct examination when testifying about the details of the telephone conversations, on cross-examination, she stated that she "pretty much" recalled the details of the telephone conversations without the notes, although she said that "it would be a lot better" if she had her notes in front of her while testifying. (R. 696-98.) Ellison never testified, because she was never asked, whether she had an independent recollection *38 of the telephone conversations or whether she could testify fully and accurately about the telephone conversations without the assistance of her notes. See, e.g., Lindley v. State, 728 So.2d 1150 (Ala. Crim.App.1997), rev'd on other grounds, 728 So.2d 1153 (Ala.1998) (holding that a memorandum was inadmissible as past recollection recorded where the State failed to present testimony to satisfy the requirement that the witness had personally observed the events referred to in the memorandum and knew them to be true). Therefore, the State failed to lay the proper foundation for admission of the notes under the "past recollection recorded" exception to the hearsay rule.
However, we find that the notes were admissible under another exception to the hearsay rulepresent sense impression. Rule 803(1), Ala.R.Evid., defines a present sense impression as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." It is the closeness in time between the event observed and the statement that describes the event that negates the likelihood of a deliberate and conscious misrepresentation and provides the requisite trustworthiness to satisfy hearsay concerns. Advisory Committee Notes to Rule 803(1), Ala.R.Evid. "While the statement may be made after the event or condition, the intervening time between the statement and the event or condition should be short." James v. State, supra, at 776.
Here, Ellison testified that she made the notes on an envelope (State's Exhibits 70 and 72) while she was listening to the telephone conversations. Immediately after each conversation, Ellison said, she rewrote the notes on pieces of paper (State's Exhibits 69 and 71). Because Ellison took the notes about the telephone conversations while the conversations were occurring or immediately thereafter, there was little likelihood of "deliberate conscious misrepresentation." Advisory Committee Notes to Rule 803(1), Ala.R.Evid. See, e.g., United States v. Santos, 201 F.3d 953, 963-64 (7th Cir.2000) (noting that "[a] person writing a report of a contemporaneous event has less time to forget what actually happened or to edit or revise his report of it" which "[m]akes the report a reliable form of hearsay and so admissible"). Therefore, the notes were admissible under the "present sense impression exception" to the hearsay rule. See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse, Inc., 71 F.3d 545, 555 (6th Cir.1995) (holding that notes made during a meeting about a conversation in the meeting were admissible under the present sense impression exception to the hearsay rule); Phoenix Mutual Life Ins. Co. v. Adams, 30 F.3d 554, 566 (4th Cir.1994) (holding that notes made during a telephone conversation were admissible under the present sense impression exception to the hearsay rule); United States v. Peacock, 654 F.2d 339, 350 (5th Cir.1981), vacated in part on other grounds on rehearing, 686 F.2d 356 (5th Cir.1982), cert. denied, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983) (holding that deceased's comments to his wife immediately following a telephone conversation with the defendant about what the defendant had said during the conversation were admissible under the present sense impression exception to the hearsay rule); and United States v. Kehoe, 562 F.2d 65, 70 (1st Cir.1977) (holding that recording secretary's informal notes indicating that the defendant had been sworn in before his grand jury testimony were admissible under the present sense impression exception to the hearsay rule).

XI.
Johnson contends that a series of statements he made to police should have *39 been introduced into evidence under the doctrine of completeness. (Issue XXII in Johnson's brief.) Specifically, Johnson contends that after the State had presented the testimony of Violet and Katrina Ellison regarding the telephone calls he had placed from jail and his admission during those calls that he had shot Deputy Hardy, the State had a "duty," under the doctrine of completeness, to introduce into evidence audiotapes of statements he gave to police, in which he apparently denied shooting Deputy Hardy, so that the jury could have what he terms "a complete statement of what had taken place in this case." (Johnson's brief at p. 86.) Because Johnson never presented this claim to trial court, we may review it only for plain error. See Rule 45A, Ala.R.App.P.
Initially, we note that nothing in the record shows that Johnson ever made any statements to police. The only "evidence" of the existence of these alleged statements is Johnson's claim in his appellate brief. This Court "cannot recognize factual assertions made in brief that are not disclosed or supported by the record; this court is bound by the record." Whitt v. State, 733 So.2d 463, 481 (Ala.Crim.App. 1998), citing Moore v. State, 457 So.2d 981 (Ala.Crim.App.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).
Nevertheless, even assuming that Johnson did give a series of statements to the police in which he denied shooting Deputy Hardy, we would still decide this issue adversely to Johnson. In King v. State, 355 So.2d 1148 (Ala.Crim. App.1978), we explained the doctrine of completeness as follows:
"If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chambers v. State, 26 Ala. 59 (1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1953). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872)."
355 So.2d at 1151. See also Ex parte Drinkard, 777 So.2d 295 (Ala.2000); and Baker v. State, 599 So.2d 60 (Ala.Crim. App.1991). Rule 106, Ala.R.Evid., which now embodies the doctrine of completeness, provides:
"When a party introduces part of either a writing or recorded statement, an adverse party may require the introduction at that time of any other part of the writing or statement that ought in fairness to be considered contemporaneously with it."
Contrary to Johnson's contention, the doctrine of completeness does not impose a "duty" on the party offering a portion of a conversation to introduce the whole of that conversation. Rather, it affords the adverse party the right to introduce the remainder of the conversation.
Moreover, the doctrine of completeness does not extend beyond a single conversation. The committee comments to Rule 106 state: "Rule 106 constitutes a rejection of that portion of the corresponding federal rule that expands the historic doctrine of completeness to include the admission of any additional writing or recorded statement that ought in fairness to be considered contemporaneously with an already admitted writing or recorded statement." In Ex parte Drinkard, supra, the Alabama Supreme Court recognized that "`[b]y its very terms, the doctrine of completeness relates only to matters contained in a single conversation.'" 777 *40 So.2d at 302, quoting Dawson v. State, 675 So.2d 897, 905 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996). Because Johnson's statements to police were not a part of the telephone conversations Johnson conducted from jail, they were not admissible under the doctrine of completeness.

XII.
Johnson contends that the trial court erred in denying his motions for a judgment of acquittal, made at the close of the State's case and at the close of all the evidence, because, he says, the evidence was insufficient to sustain his conviction. (Issues VII and VIII in Johnson's brief.)
"`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.), cert. denied, 368 So.2d 877 (Ala.1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Crim. App.), cert. denied, 359 So.2d 843 (Ala. 1978).
"`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Crim.App.1976); Edson v. State, 53 Ala.App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala.App. 4, 325 So.2d 520 (1975), cert. denied, 295 Ala. 398, 325 So.2d 531 (1976)."'"
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Crim.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), quoting Freeman v. State, 505 So.2d 1079, 1083-84 (Ala.Crim.App.1986), quoting, in turn, Johnson v. State, 378 So.2d 1164, 1169 (Ala.Crim.App.), writ quashed, 378 So.2d 1173 (Ala.1979).
"`The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Crim.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Crim.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala. Crim.App.1983).'"
Pilley v. State, 789 So.2d 870, 877 (Ala. Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, 789 So.2d 888 (Ala. 2000), quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992).

A.
First, Johnson contends that the evidence was insufficient to sustain his conviction because, he says, the State failed to prove that Deputy Hardy was "on duty" at the time of his death. See § 13A-5-40(a)(5), Ala.Code 1975.
Section 13A-5-40(a)(5), Ala.Code 1975, provides that the "[m]urder of any police officer, sheriff, deputy, state trooper, *41 federal law enforcement officer, or any other state or federal peace officer of any kind, or prison or jail guard, while such officer or guard is on duty, regardless of whether the defendant knew or should have known the victim was an officer or guard on duty, or because of some official or job-related act or performance of such officer or guard" is a capital offense. Section 13A-5-40(a)(5) defines the single capital offense of the murder of a law-enforcement officer, but provides two alternative theories of proof: (1) that the officer was "on duty"; or (2) that the murder was committed "because of some official or job-related act." Thus, to prove the capital murder of a police officer, it is incumbent on the State to prove that the police officer was "on duty" at the time of his death, or that the officer was murdered "because of some official or job-related act or performance."
In this case, the indictment charged, in pertinent part, that Johnson "did intentionally cause the death of William G. Hardy by shooting him with a pistol, while William G. Hardy was on duty as a deputy sheriff, or because of some official or job-related act or performance of William G. Hardy as a deputy sheriff or peace officer." (C. 16.) See Tucker v. State, 537 So.2d 59 (Ala.Crim.App.1988) (holding that an indictment charging both theories under § 13A-5-40(a)(5) in a single count is proper). The jury was instructed that it could find Johnson guilty of the capital murder of Deputy Hardy if it found that Deputy Hardy was "on duty" at the time of his death or if it found that Deputy Hardy was killed "because of some official or job-related act or performance." (R. 1073-74.) The jury returned a general verdict finding that Johnson was "guilty of the capital offense, as charged in the indictment." (C. 30.) Although the jury made no specific finding as to which theory on which it based its verdict, i.e., whether it found that Deputy Hardy was on duty at the time of his death or that Deputy Hardy was killed because of some official or job-related act, it is well settled that a jury instructed on both theories must reach a unanimous verdict "only as to its verdict finding that [the defendant] intentionally murdered a law enforcement officer in violation of § 13A-5-40(a)(5), not as to whether the murder occurred while the law enforcement officer was on duty or occurred because of an official act on the part of the officer." Ex parte Madison, 718 So.2d 104, 108 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998).
On appeal, Johnson argues only that the State failed to present sufficient evidence that Deputy Hardy was on duty at the time of his death; he makes no argument as to whether Deputy Hardy was killed because of an official or job-related act. The record reflects that although Johnson was charged, and the jury instructed, regarding both theories under § 13A-5-40(a)(5), both the State and the defense focused primarily on whether Deputy Hardy was on duty at the time of his death. Because no argument was made during trial, by either side, as to whether Deputy Hardy was killed because of an official or job-related act; because it is clear from the record that the jury's primary focus was whether Deputy Hardy was on duty at the time of his death, not whether Deputy Hardy was killed because of an official or job-related act; and because the only argument on appeal is whether Deputy Hardy was on duty at the time of his death, it is unnecessary for this Court to address whether Deputy Hardy was murdered because of an official or job-related act.
Johnson contends that the State failed to prove that Deputy Hardy was on duty at the time of his death because, Johnson says, "[t]here was no evidence of, and no *42 reason to believe, that there was any emergency to cause Deputy Hardy to walk out of the hotel [and][i]t was reasonable to conclude from the evidence at trial that he walked outside to stretch his legs or for a breath of fresh air." (Johnson's brief at p. 61.) In essence, Johnson argues that the evidence showed that Deputy Hardy was acting in his capacity as a security guard, i.e., a private citizen, not in his capacity as a deputy sheriff, when he was killed. We disagree.
In Whitely v. Food Giant, Inc., 721 So.2d 207 (Ala.Civ.App.1998), Gary Dison, an off-duty police officer, was "moonlighting" as a security guard for a grocery store in which Whitely was a customer. Whitely wanted to use a pay telephone at the store, and waited for a woman who was using the telephone to finish. When the woman finished, Whitely attempted to use the telephone; however, the woman told him that he could not use the telephone and began yelling and cursing at him. When Dison arrived at the scene, Whitely began explaining what had happened; the woman continued to yell. When Whitely finished, he turned and again attempted to use the pay telephone. At this point, the woman began telling Dison her side of the story, during which the woman referred to Whitely as a "nigger." Whitely then turned and began walking toward the woman with his hand balled into a fist. When Dison saw Whitely walking toward the woman, he grabbed Whitely and held him until other officers arrived. Whitely was arrested and charged with resisting arrest and disorderly conduct; he was acquitted. However, Whitely then sued the grocery store, seeking damages based on allegations of assault and battery, among other torts. A summary judgment was entered in favor of the grocery store. On appeal, the Alabama Court of Civil Appeals held that the summary judgment was proper because, it said, Dison was acting as a police officer when he grabbed and subsequently arrested Whitely, and not as a security guard for the store. The Court stated that "Dison's status changed to that of a police officer when he saw Whitely approaching the woman while making a fist." 721 So.2d at 209. See also Dinmark v. Farrier, 510 So.2d 819, 821 (Ala. 1987) (holding that an off-duty police officer "moonlighting" as a security guard at a grocery store was acting in his capacity as a police officer and not in his capacity as a security guard when he arrested the plaintiff for disorderly conduct after witnessing the plaintiff's unruly behavior); Ex parte Kennedy, 486 So.2d 493, 495 (Ala.1986) (holding that an off-duty police officer who was working as an exterminator and noticed three plants that appeared to be marijuana "stepped out of his exterminator role and became a government agent" when he examined the plants and took a leaf for verification); Perry v. Greyhound Bus Lines, 491 So.2d 926 (Ala.1986) (holding that status of off-duty police officers "moonlighting" as security guards was changed to that of police officers after witnessing a crime); Driskill v. State, 376 So.2d 678, 679 (Ala.1979) (holding that an off-duty police officer employed as a security guard for a high school football game was acting in his capacity as a police officer, not in his capacity as a security guard, when he attempted to remove a student from the stadium and that student physically resisted); Robinson v. State, 361 So.2d 1113, 1114 (Ala.1978) (holding that an off-duty police officer "moonlighting" as a security guard was not transformed from a security guard to a police officer when he received a report of a fight, because he had not witnessed any crime); and Hutto v. State, 53 Ala.App. 685, 689, 304 So.2d 29, 33 (Ala.Crim.App.), cert. denied, 293 Ala. 758, 304 So.2d 33 (Ala.1974) (holding that an off-duty police officer employed as a *43 security guard for a high school football game was acting in his capacity as a police officer, not in his capacity as a security guard, when he was assaulted after he had witnessed the appellant, a minor, in possession of beer).
The clear import of these cases is that when an off-duty police officer witnesses a criminal offense or suspects criminal activity, the officer's status changes and, from that point on, he is considered to be acting in his capacity as a police officer and not in his capacity as a private citizen, i.e., he is considered to be "on duty." Here, the State presented sufficient evidence from which the jury could have reasonably inferred that Deputy Hardy was "on duty" at the time of his death.
In a telephone conversation overheard by Violet Ellison, Johnson stated that he had followed Michael Ansley to the hotel to rob him; that after Ansley had switched cars and left the hotel, Ansley's girlfriend Monika (later identified as Monika Daniels), came back and an argument ensued; and that during the argument, Monika pulled out a gun. According to Johnson, Deputy Hardy came out of the rear door of the hotel because he had heard the disturbance. Evidence showed that when Deputy Hardy left the hotel to investigate the disturbance, he left a cup of coffee, his radio, and a cigarette burning in an ashtray in the atrium of the hotel, indicating that Deputy Hardy left the hotel quickly and hastily. Yolanda Chambers, who testified on Johnson's behalf, stated that she had given several different stories to police regarding the events at the hotel on the night of July 18-19, 1995. One of these stories was that she, Johnson, Ardragus Ford, and Latanya Henderson were engaged in some sort of drug transaction, which Deputy Hardy happened upon when he came out of the hotel, and that Deputy Hardy was murdered because of this drug transaction. Another of Chambers's stories, one consistent with Johnson's own statements, was that they were at the hotel to rob Michael Ansley. Although Chambers testified that none of these stories were true, Chambers's credibility and the veracity of her numerous different storieswas a question for the jury.
The jury could have reasonably inferred from the evidence presented that Deputy Hardy, while drinking a cup of coffee and smoking a cigarette in the atrium of the hotel, was suddenly startled by a disturbance in the rear parking lot; that Deputy Hardy quickly left the hotel, leaving his cup of coffee, his radio, and his cigarette burning in an ashtray, to investigate the disturbance; and that when Deputy Hardy stepped out into the rear parking lot, he witnessed a large group of people (the evidence showed that at least five people were present in the lot) engaged in some sort of criminal activity. From the evidence, the jury could have concluded that Deputy Hardy witnessed, or at least suspected, either a drug transactionbased on Chambers's previous statementsor an imminent assault, based on Johnson's own admission that Monika Daniels was brandishing a pistol. The moment he witnessed criminal activity, Deputy Hardy's status changed from that of a security guard to that of a deputy sheriff and he was then considered to be "on duty." Therefore, we find that there was sufficient evidence from which the jury could have reasonably concluded that Deputy Hardy was "on duty" at the time he was murdered.
Accordingly, the trial court did not err in denying Johnson's motions for a judgment of acquittal.

B.
Second, Johnson contends that the evidence was insufficient to sustain his conviction because, he says, the State *44 failed to prove that he intended to kill Deputy Hardy. Although Johnson moved for a judgment of acquittal at the close of the State's case and at the close of all evidence, Johnson specifically argued in both motions that the State had failed to prove that Deputy Hardy was on duty at the time of his death. Because Johnson did not argue that the State had failed to prove his intent, we may review this claim only for plain error. See Rule 45A, Ala. R.App.P.
"`"Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence."'" Pilley, supra, 789 So.2d at 876, quoting Hunt v. State, 642 So.2d 999, 1008 (Ala.Crim.App. 1993), aff'd, 642 So.2d 1060 (Ala.1994). Intent "`"may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances."'" Farrior v. State, 728 So.2d 691, 695 (Ala.Crim.App.1998), quoting Jones v. State, 591 So.2d 569, 574 (Ala. Crim.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim. App.), cert. denied, 390 So.2d 1168 (Ala. 1980). See also Scanland v. State, 473 So.2d 1182, 1185 (Ala.Crim.App.), cert. denied, 474 U.S. 1035, 106 S.Ct. 602, 88 L.Ed.2d 581 (1985) ("[i]ntent may be inferred from the use of a deadly weapon"). In Davis v. State, 740 So.2d 1115 (Ala. Crim.App.1998), aff'd, 740 So.2d 1135 (Ala. 1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000), we stated:
"[T]he question of a defendant's intent at the time of the commission of a crime is usually a question for the jury. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983).
"`In Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), this court stated:
"`"`[T]he element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim. App.), cert. denied, 390 So.2d 1168 (Ala.1980). Accord, Fears v. State, 451 So.2d 385, 387 (Ala.Crim.App. 1984); Young v. State, 428 So.2d 155, 158 (Ala.Crim.App.1982)."
"`Additionally, in Bishop v. State, 482 So.2d 1322, 1326 (Ala.Crim.App.1985), this court held:
"`"`Intent may be presumed from the act of using a deadly weapon. McArdle v. State, 372 So.2d 897 (Ala. Crim.App.), cert. denied, 372 So.2d 902 (Ala.1979), and from the character of the assault, including the nature and amount of force used in the fatal injury. Flint v. State, 370 So.2d 332 (Ala.Crim.App.1979).'
"`"Chaney v. State, 417 So.2d 625, 627 (Ala.Crim.App.1982). `However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him.' Free v. State, 455 So.2d 137 (Ala.Crim.App.1984). In Underhill on Criminal Evidence, § 540 (3d ed.1923), we find the following statement regarding proof of intent in an attempted murder charge:
"`"`Thus, as a general rule, the force or violence which was employed must be proven to have been intentional.... The intention to do great bodily harm, to murder or commit any other crime by means *45 of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another.'"'
"Long v. State, 668 So.2d 56, 60 (Ala. Crim.App.1995)."
740 So.2d at 1120. See also Hutcherson v. State, 727 So.2d 846 (Ala.Crim.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).
Here, there was ample evidence that Johnson intended to kill Deputy Hardy, including the following: the use of a deadly weapon; the circumstances surrounding the murder; the extent of the victim's injuries; and Johnson's own admission in a telephone conversation that he had "shot the fucker in the head" because Deputy Hardy had "got in [his] business, messin' up [his] shit." (R. 683-84.) Therefore, we find no error, plain or otherwise, as to this claim.

XIII.
Johnson contends that the prosecutor engaged in misconduct during closing arguments at the guilt phase of his trial. (Issue XII in Johnson's brief.) Because Johnson did not object to the comments that he now challenges, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Moreover,
"[t]his court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."` Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of *46 the complete closing arguments to the jury.' Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
Ferguson v. State, 814 So.2d 925, 946 (Ala. Crim.App.2000).
During closing argument, the prosecutor stated:
"Around four o'clock in the morning, after the murder, we know that ToForest Johnson was with a man named Ardragus Ford and Latanya Henderson and Yolanda Chambers in the Monte Carlo automobile at the Super 8 motel in Homewood. Now, what happened in that car? You heard Officer Evans tell you, and, bear in mind, you heard, ladies and gentlemen, the tape of the beginning of the police involvement in this case. It's been explained to you what Double Ought means, and that a number of police officers responded, as you would expect, to do what they could if anything could be done, and so forth.
"You also heard exactly what happens in these situations as policemen show up and start talking to people. Because they want to know as quick as they can what happened, because the quicker they get to the scene and the quicker they put something out on the radio, the easier it is for other people who are headed, still, towards the scene to see who's going away from the scene, if they can spot something worthwhile.
"And you heard that immediate radio traffic, now, it's hard to understand; now, of course, these guys that do it as a living, they can understand the radio much easier than I can because I don't sit around and listen to them eight hours a day like they do. But if you listen to that radio traffic you can tell that there's different descriptions going out. It doesn't mean much of anything other than somebody thinks this particular automobile might be involved, or that they think they saw an automobile that might be involved or that they think they got a description right.

"Now, contrast that with what Officer Evans was doing at four o'clock in the morning, because four o'clock in the morning is over three hours later, and in those three hours some things have been boiled down and all he knows is that when he spots that 1972, I think '72, whatever it is, when he spots that Monte Carlo he knows it matches the description of what he's been told that's left the scene, and that's why he turns his attention to it. Or, at least matches the description of one of the cars leaving the scene. That's why he turned his attention to it."
(R. 920-22.) (Emphasis on portion of closing argument complained of by Johnson.) During rebuttal argument, the prosecutor further stated:
"You'll have this recording [of the radio traffic] to go back there in the back with you, and you listen to the vehicles that were described. Somebody talked *47 about a black vehicle with some type of convertible top. You'll have this [indicating photograph of vehicle Johnson was found in] back there with you, I encourage you to look at the top."
(R. 1056.)
Johnson contends that the prosecutor's comments regarding the radio traffic and the numerous descriptions of vehicles allegedly seen leaving the hotel shortly after the murder were improper. In this regard, Johnson's entire argument is as follows:
"The tape recording [of the radio traffic] was entered not to prove the kind of car, but to show that police officers were looking for a car after the shooting had taken place. Yet, on [sic] closing argument, the tape `proves' that the car in which ToForest Johnson rode was the car at the scene. This argument was improper as it argued a proposition that the tape recording did not prove."
(Johnson's brief at pp. 72-73.)
We disagree with Johnson's characterization of the prosecutor's argument. Contrary to Johnson's contention, the prosecutor did not argue that the tape recording of the radio traffic "proved" that the 1972 Monte Carlo in which Johnson was found several hours after the murder was, in fact, at the crime scene. Rather, the prosecutor merely pointed out that one of the numerous descriptions of automobiles seen leaving the hotel shortly after the murder matched the automobile in which Johnson was found and then urged the jury to draw the reasonable inference that Johnson was present at the time of the murder. "`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.'" Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App. 2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).
"`The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim. App.), cert. denied, 340 So.2d 1140 (Ala. 1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala. Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App.1978).'"
Ballard v. State, 767 So.2d 1123, 1135 (Ala. Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
Clearly, the prosecutor in this case was examining the evidence admitted at trial and was presenting his impressions from that evidence. His comments were legitimate and proper.

XIV.
Johnson contends that he was denied effective assistance of trial counsel. (Issues XIV, XIX, and XX in Johnson's brief.) Specifically, Johnson contends that his trial counsel were ineffective for allegedly:
1. Failing to present allegedly exculpatory evidence;

*48 2. Failing to subpoena telephone records to rebut the testimony of Katrina and Violet Ellison regarding the telephone calls he placed from jail;
3. Failing to request any jury charges;
4. Failing to use juror questionnaires during voir dire;
5. Failing to investigate the facts of the case; and
6. Failing to present mitigating evidence at the sentencing phase of the trial.
Only three of these claims were included in Johnson's motion for a new trial. Those claims that are being raised for the first time on appeal will be reviewed under the plain-error rule. See Rule 45A, Ala. R.App.P. See also Ex parte Frazier, 758 So.2d 611, 615-16 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000); and James v. State, 788 So.2d 185 (Ala.Crim.App.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2005, 149 L.Ed.2d 1007 (2001).
"In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'

"Id. at 687, 104 S.Ct. 2052.
"`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."` Daniels v. State, 650 So.2d 544, 552 (Ala.Crim.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.

"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Crim. App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Crim. App.1985).
"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because *49 of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
"And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."
McNair v. State, 706 So.2d 828, 839 (Ala. Crim.App.1997).
We have reviewed all of Johnson's allegations of ineffective assistance of counsel and conclude that Johnson has failed to satisfy his burden of proof under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to any of his claims. We address each in turn.

A.
Johnson contends that his trial counsel were ineffective for failing to present allegedly exculpatory evidence. He makes two arguments in this regard.
First, Johnson claims that there were three witnesses who allegedly saw a vehicle exiting the rear parking lot of the hotel shortly after Deputy Hardy's murder. According to Johnson, the description of the vehicle given by these witnesses did not match the vehicle in which he was found early the next morning, i.e., a black 1972 Monte Carlo automobile. Johnson maintains that his trial counsel were ineffective for not calling the three witnesses to testify in order to support his alibi defense. However, amidst his argument Johnson concedes that he does not know whether his counsel were even aware of the existence of these witnesses or the descriptions of the vehicle they allegedly saw. Clearly, if Johnson's counsel did not know about these witnesses, they could not be ineffective for failing to call them.
In addition, the mere fact that the descriptions of the vehicle these witnesses saw leaving the scene did not match the vehicle in which Johnson was later found does not support Johnson's alibi defense. During trial, the State presented evidence that the police had received several different descriptions of vehicles allegedly seen leaving the rear parking lot of the hotel on the night of Deputy Hardy's murder and that the police had issued numerous BOLOs for those different vehicles. Only one of these numerous BOLOs matched the vehicle in which Johnson was found the next morning, the BOLO for a black vehicle. Testimony from three additional witnesses regarding three additional descriptions of vehicles that did not match the vehicle in which Johnson was later found would have been cumulative and would have added nothing to Johnson's defense.
*50 Johnson also claims that the Jefferson County Sheriffs Department issued a press release in which the Department apparently listed descriptions of numerous vehicles that the police had received from various witnesses. As with the three witnesses, Johnson maintains that none of the vehicles listed in the press release matched the vehicle in which he was found the next morning, and that his counsel were ineffective for not introducing the press release in order to support his alibi defense. He further maintains that his counsel should have stressed, as part of their trial strategy, the numerous and varying descriptions of vehicles from witnesses. The record reflects, however, that trial counsel did, in fact, stress the differing descriptions of vehicles that were given by witnesses at the scene during opening statements and during cross-examination of several witnesses. Although trial counsel did not introduce into evidence the press release from the Jefferson County Sheriffs Department showing those differing descriptions, as noted above, there was ample evidence before the jury of the numerous descriptions the police received. The press release would merely have been cumulative to the other evidence. Therefore, Johnson has failed to show that his counsel were ineffective in this regard.

B.
Johnson also contends that his trial counsel were ineffective for not subpoenaing telephone records to rebut the testimony of Katrina and Violet Ellison regarding the telephone calls placed by him from the Jefferson County jail. Johnson alleges that these telephone records could have been used to show "that the calls were not made at all, or were of an unusual time, or length of call." (Johnson's brief at p. 78.)
Johnson's claim in this regard is nothing but speculation. He has failed to show, or even to allege, how the telephone records could have benefited his defense. In addition, as noted in Part IX.A. of this opinion, the record reflects that, during the pretrial hearing on Johnson's motion in limine to exclude any testimony about the telephone calls, the State introduced the telephone records to show that telephone calls were, in fact, placed from the Jefferson County jail to the home of Violet Ellison. The records showed that calls were placed from a number assigned to the 9th Floor, Block B, of the Jefferson County jail (where Johnson was housed) to the telephone number of Violet and Katrina Ellison. The records corroborate Violet and Katrina Ellison's testimony regarding the dates and times of the calls from Johnson. As the State correctly points out in its brief to this Court, because Johnson was clearly unable to deny the existence of the telephone calls, his trial counsel obviously adopted a strategy of denying the content of those calls, i.e., that Johnson admitted that he had shot Deputy Hardy. Johnson has failed to show that this was not sound trial strategy, especially given the overwhelming evidence presented by the State proving the existence of the calls. Therefore, Johnson has failed to show that his counsel were ineffective in this regard.

C.
Johnson further contends that his trial counsel failed to investigate the facts of the case. Johnson provides no facts or argument to support this conclusory statement, and this Court is hard-pressed even to consider this to be a "claim" of ineffective assistance of counsel. Nevertheless, we have reviewed the record in this case and can find no evidence whatsoever to suggest that trial counsels' investigation was, in any way, deficient.

*51 D.
Johnson next contends that his trial counsel should have submitted requested jury instructions and used juror questionnaires during voir dire. However, the record reflects that trial counsel did request several jury instructions and, as noted in Part IV of this opinion, the record suggests that juror questionnaires were, in fact, used. Clearly then, Johnson's counsel were not ineffective in this regard.

E.
Finally, Johnson contends that his trial counsel were ineffective for failing to present mitigating evidence at the sentencing phase of the trial. Johnson's entire argument in this regard is as follows: "No attempt was made to put on any case at the sentencing phase of the trial. There are groups of experts available who could assist, but none were contacted.... Defense counsel ... did not conduct a mitigation defense, did not attempt to rebut any part of the probation report, and did not pursue an aggressive and effective defense." (Johnson's brief at p. 78.) Johnson does not allege what type of experts could have assisted his defense, what evidence those experts could have presented, what additional mitigation evidence existed that counsel did not present, or what evidence could have been presented to rebut the probation report. Clearly, Johnson has failed to show that his counsel were ineffective in this regard.

XV.
Johnson contends that Alabama's death-penalty statute, specifically § 135-40(a)(5), Ala.Code 1975,[8] is unconstitutional because, he says, it is arbitrary and fails to narrow the class of death-eligible defendants. (Issue XVI in Johnson's brief.) In Ex parte Harrell, 470 So.2d 1309 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985), superseded by statute as recognized in Gurley v. State, 639 So.2d 557 (Ala.Crim.App. 1993), the Alabama Supreme Court held that § 13A-5-40(a)(5) is "a reasonable exercise of legislative authority which is neither arbitrary nor capricious in imposing capital punishment upon one who intentionally and knowingly takes the life of a police officer, while that officer is engaged in carrying out his appointed duties, protecting the health, welfare, and property of the citizens he serves." 470 So.2d at 1318.
Furthermore, in Ex parte Woodard, 631 So.2d 1065 (Ala.Crim.App.1993), cert. denied, 662 So.2d 929 (Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994), this Court, in determining whether § 13A-5-40(a)(15), Ala. Code 1975 (murder of a child under the age of 14 years), sufficiently narrowed the class of "death-eligible" defendants, said:
"`A capital sentencing scheme must, in short, provide a "`meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.'" [Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976)], quoting Furman v. Georgia, [408 U.S. 238, 313, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972)] (White, J., concurring).
"`This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.'
*52 "Godfrey v. Georgia, 446 U.S. 420, 427-428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).
"Alabama's capital offense statute includes a sentencing scheme that is neither arbitrary nor capricious. Ex parte Hays, 518 So.2d 768, 774 (Ala.1986); Daniels v. State, 534 So.2d 628, 642-45 (Ala.Crim.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).
"`The Supreme Court has required heightened reliability in the imposition of the death penalty, but the Court has not mandated any particular state statutory approach to capital punishment. To minimize the risk of arbitrary action and provide individualized sentencing, however, the Court has imposed two general requirements on the capital sentencing process. First, a state must channel the sentencer's discretion in order to "genuinely narrow the class of persons eligible for the death penalty and ... [thus] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Second, the State may not limit the sentencer's consideration of any relevant evidence that might lead the sentencer to decline to impose the death penalty.
"`The required narrowing of the class of death-eligible defendants may occur at either the guilt or the sentencing phase of a capital trial. When narrowing is accomplished during the sentencing phase, the sentencer determines whether certain characteristics of the crime, known as aggravating circumstances, distinguish the gravity of the offense so as to justify the imposition of the death penalty.'
"Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1471-73 (1993) (footnotes omitted).
"The required narrowing of the class of death-eligible defendants accused of violating § 13A-5-40(a)(15) occurs at the sentencing phase of the capital trial when the sentencer must determine the existence of at least one of the aggravating circumstances listed in § 13A-5-49. See §§ 13A-5-46(e); 13A-5-47(d) and (e). Furthermore, `the statutory aggravating circumstances may not be added to or expanded.' Nelson v. State, 405 So.2d 392, 400 (Ala.Crim.App.1980), reversed on other grounds, 405 So.2d 401 (Ala.1981).
"In order for a defendant to be sentenced to death upon a conviction under § 13A-5-40(a)(15), the defendant must be guilty of the intentional murder of a child under the age of 14 years and the sentencer must find the existence of at least one of the aggravating circumstances enumerated in § 13A-4-49, thereby narrowing the class of `death-eligible' defendants."
631 So.2d at 1069-70. See also Farrior v. State, 728 So.2d 691, 702 (Ala.Crim.App. 1998) (holding that § 13A-5-40(a)(17), Ala. Code 1975murder of a victim when the victim is inside a vehiclewas constitutional); and May v. State, 710 So.2d 1362, 1364-65 (Ala.Crim.App.1997)(same).
Similarly, for a defendant to be sentenced to death upon conviction under § 13A-5-40(a)(5), the defendant must be guilty of the intentional murder of a law-enforcement officer while that officer is on duty or because of some job-related act and the sentencer must find the existence of at least one of the statutory aggravating circumstances enumerated in § 13A-5-49, Ala.Code 1975, thereby narrowing the class of "death-eligible" defendants.
*53 Therefore, Johnson's claim that § 13A-5-40(a)(5) is unconstitutional is meritless.

XVI.
Johnson contends that the death penalty in general, and electrocution in particular, constitutes cruel and unusual punishment. (Issue XVIII in Johnson's brief.) However, both the United States Supreme Court and Alabama courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution as a means of capital punishment also does not constitute cruel and unusual punishment. See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Ex parte Burgess, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Ray v. State, 809 So.2d 875 (Ala.Crim.App.2001); Waldrop v. State, [Ms. CR-98-2316, December 1, 2000] ___ So.2d ___ (Ala.Crim.App.2000); Wynn v. State, 804 So.2d 1122 (Ala.Crim. App.2000); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000); West v. State, 793 So.2d 870, 887 (Ala.Crim.App.2000); Jackson v. State, 791 So.2d 979 (Ala.Crim. App.), cert. denied, 791 So.2d 1043 (Ala. 2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001); Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001); Williams v. State, 795 So.2d 753 (Ala.Crim.App. 1999), aff'd, 795 So.2d 785 (Ala.2001); Wilson v. State, 777 So.2d 856 (Ala.Crim.App. 1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Duncan v. State, [Ms. CR-95-1544, September 17, 1999] ___ So.2d ___ (Ala.Crim.App.1999), aff'd, [Ms. 1990652, March 30, 2001] ___ So.2d ___ (Ala.2001); Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1997), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999); Scott v. State, 728 So.2d 164 (Ala.Crim.App.1997), aff'd, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); and Williams v. State, 627 So.2d 985 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). Accordingly, this claim is meritless.

XVII.
Johnson contends that the trial court improperly used a youthful offender adjudication to negate the statutory mitigating circumstance of "no significant history of prior criminal activity." (Issue XIII in Johnson's brief.) In its sentencing order, the trial court stated, in pertinent part:
"The Court finds that the following mitigating circumstances do not exist in this case:
"A. The defendant has no significant history of prior criminal activity. The Court finds that the defendant does have a significant history of prior criminal activity. Among other offenses the Court is aware of the fact that the defendant had just gotten revoked on 9-14-94 on an order of probation arising out of an unlawful possession of a controlled substance in which he had been granted youthful offender status and that the defendant was found guilty of another drug possession charge in July of 1994 in which he received a two year sentence. This was just a few months before the killing herein and the defendant was on parole at the time of the killing of Deputy Hardy. Upon the defendant's release on $100,000.00 bond in this case on February 18, 1997, the defendant subsequently picked up an additional drug charge and a receiving stolen property charge in another county. The *54 Court has not considered these out of county charges as aggravating circumstances herein but these offenses do serve to rebut any argument for a lack of significant criminal history."
(C. 102.)
It is well settled that "[o]nly convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity." Freeman v. State, 651 So.2d 576, 598 (Ala.Crim.App. 1994), after remand, 776 So.2d 160 (Ala. Crim.App.1999), aff'd, 776 So.2d 203 (Ala.), cert. denied, 531 U.S. 966, 121 S.Ct. 400, 148 L.Ed.2d 308 (2000). See also McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App. 2000); Gamble v. State, 791 So.2d 409, 448 (Ala.Crim.App.2000); Smith v. State, 727 So.2d 147, 155 (Ala.Crim.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); and Parker v. State, 587 So.2d 1072, 1098 (Ala.Crim.App.1991), after remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). Neither youthful offender adjudications nor juvenile adjudications may be used. See Carroll v. State, [Ms. CR-97-1019, August 27, 1999] ___ So.2d ___ (Ala.Crim.App.1999), aff'd in pertinent part, remanded on other grounds, [Ms. 1990908, April 20, 2001] ___ So.2d ___ (Ala.2001) (youthful offender adjudications are not convictions and cannot be used to negate statutory mitigating circumstance of no significant history of prior criminal activity, although those adjudications may be considered in determining what weight to give that mitigating circumstance); Ex parte Burgess, 811 So.2d 617 (Ala.2000) (juvenile adjudications are not convictions and cannot be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity, although those adjudications may be considered in determining what weight to give that mitigating circumstance); Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999) (juvenile adjudications cannot be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity); Hodges v. State, [Ms. CR-98-1988, March 30, 2001] ___ So.2d ___, ___ (Ala.Crim.App.2001) (same); and Freeman, supra (same). In addition, although not argued by Johnson on appeal, we note that criminal activity that does not result in a conviction likewise cannot be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity. See, e.g., Clark v. State, [Ms. CR-99-1062, December 1, 2000] ___ So.2d ___, ___ (Ala.Crim.App. 2000); and Gamble, supra.
The record indicates that the trial court improperly used Johnson's 1992 youthful offender adjudication for unlawful possession of a controlled substance and his three 1997 arrests that had not (yet) resulted in convictions to negate the statutory mitigating circumstance of no significant history of prior criminal activity. However, notwithstanding Johnson's youthful offender adjudication and numerous arrests, the record reflects that Johnson had a series of misdemeanor convictions and one felony conviction that would have precluded the trial court from finding that Johnson had no significant history of prior criminal activity. Misdemeanor convictions may be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity. See, e.g., Ex parte Davis, supra; Williams v. State, 601 So.2d 1062 (Ala.Crim.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992); McMillian v. State, 594 So.2d 1253 (Ala.Crim.App.1991), remanded *55 on other grounds, 594 So.2d 1288 (Ala.1992), on return to remand, 616 So.2d 933 (Ala.Crim.App.1993); Tomlin v. State, 516 So.2d 790 (Ala.Crim.App.1986), rev'd on other grounds, 540 So.2d 668 (Ala.1988); and Richardson v. State, 376 So.2d 205 (Ala.Crim.App.1978), aff'd, 376 So.2d 228 (Ala.1979). The presentence report reflects that Johnson was convicted in 1991 for disorderly conduct and for drinking in public; in 1992 for driving without a license and with an improper tag; in 1993 for disorderly conduct; and in 1995 for driving while his license was suspended. In addition, Johnson was convicted in 1994 for unlawful possession of a controlled substance, a Class C felony. Because Johnson's felony and misdemeanor convictions were sufficient to negate the statutory mitigating circumstance of no significant history of prior criminal activity, we conclude that the trial court's error in considering Johnson's youthful offender adjudication and arrests was harmless. See, e.g., Ex parte Davis, supra, 718 So.2d at 1178 (trial court's consideration of prior juvenile adjudications held harmless where the defendant had a prior felony conviction for robbery as an adult); and Madison v. State, 718 So.2d 90, 98 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998) (trial court's consideration of prior juvenile adjudications held harmless where the defendant had history of prior felony convictions as an adult).

XVIII.
Finally, Johnson contends that a multitude of his constitutional rights were violated and that his trial was fundamentally unfair. (Issue XI in Johnson's brief.) In support of this claim, Johnson merely cites a string of United States Supreme Court cases, the United States Constitution, and the Alabama Constitution. He offers no argument or factual support for his claim and, other than citations to cases, he does not even identify which of his constitutional rights he believes were violated. Despite the lack of argument, however, in accordance with Rule 45A, Ala.R.App.P., we have reviewed the record of Johnson's trial and we find no violation of his constitutional rights.

XIX.
In accordance with Rule 45A, Ala. R.App.P., we have examined the record for any plain error with respect to Johnson's capital murder conviction, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Johnson's sentence in accordance with § 13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Johnson's capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar *56 cases, considering both the crime and the defendant.
After the jury convicted Johnson of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 10-2.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Johnson to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense.
In its findings, the trial court found the existence of two statutory aggravating circumstances: (1) that the murder was committed while Johnson was under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; and (2) that the murder was committed to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws, see § 13A-5-49(7), Ala.Code 1975. The trial court found one statutory mitigating circumstance to exist: that Johnson was 22 years old at the time of the crime, see § 13A-5-51(7), Ala.Code 1975. The trial court found no nonstatutory mitigating circumstances under § 13A-5-52, Ala.Code 1975, to exist.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the statutory mitigating circumstance in the case, the trial court found that the aggravating circumstances outweighed the statutory mitigating circumstance. Accordingly, the trial court sentenced Johnson to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence and we find no plain error or defect in the sentencing phase of the proceedings.
Johnson was convicted of the murder of a law-enforcement officer while the officer was on duty or because of some official or job-related act. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(5), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Sibley v. State, 775 So.2d 235 (Ala. Crim.App.1997), aff'd, 775 So.2d 246 (Ala. 2000); Madison v. State, 718 So.2d 90 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998); Clemons v. State, 720 So.2d 961 (Ala.Crim.App. 1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Block v. State, 744 So.2d 404 (Ala.Crim.App.1997); Carr v. State, 640 So.2d 1064 (Ala.Crim.App.1994); and Harrell v. State, 470 So.2d 1303 (Ala. *57 Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
After carefully reviewing the record of the guilt phase and the sentencing phase of Johnson's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory mitigating circumstance, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstance, and that death is the appropriate sentence in this case. Considering the crime committed, and Johnson, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Johnson's conviction and his sentence of death are affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.[9]
NOTES
[1] This case was originally assigned to another judge on this Court. It was reassigned to Judge Shaw on January 16, 2001. Although Judge Shaw was not a member of this Court when this case was orally argued, he has listened to the audiotape of the argument.
[2] As part of his Batson motion, Johnson's counsel alluded to facts about the jurors who were allegedly struck by the State, such as the jurors' addresses, marital status, and occupation; none of these facts was revealed during voir dire. This suggests that these facts were obtained from another source, most likely juror questionnaires.
[3] We note that in his reply brief, Johnson concedes that there is nothing in the record to support his claim that the courtroom was filled with uniformed law-enforcement officers, and he requests that this Court remand this case to the trial court for that court "to determine if the record can be supplemented to show abuse." (Johnson's reply brief at p. 23.) In essence, Johnson is requesting that we remand this case for a hearing on this issue so that Johnson can create a record for appellate review. As the Alabama Supreme Court stated in Ex parte McNair, 653 So.2d 353, 360 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), "[w]e specifically decline this request, for to do otherwise would unduly enlarge the scope of the plain error review as authorized by our appellate rules."
[4] We note that Johnson again concedes in his reply brief that there is nothing in the record to support his claim that the prosecutor pursued inconsistent theories of prosecution and he again requests that we remand this case to the trial court so that he can create a record on this issue for appellate review. For the reason stated in footnote 3, we decline this request.
[5] The record reflects that this was Johnson's second trial for the murder of Deputy Hardy; his first trial ended in a mistrial. Johnson filed his motion in limine before the first trial and a pretrial hearing was held. The trial court denied the motion. Before his second trial, Johnson requested that the written motion, as well as a transcript of the hearing that was held before the first trial be incorporated into the present record in order to preserve the motion and the ruling of the trial court. The trial court agreed and again denied the motion.
[6] Ellison said that she remembered the exact date because August 2 is her birthday.
[7] Ellison's testimony was inconsistent with Annie Colvin's testimony that Michael Ansley had dropped off his gold Lexus at the hotel and picked up his red Lexus.
[8] In his brief, Johnson actually cites § 13A-5-40(a)(15), Ala.Code 1975; however, because Johnson was not convicted under this subsection, we assume this is a typographical error.
[9] Although Judge Wise was not a member of this Court when this case was orally argued, the audiotape and videotape of the argument have been made available to her.